

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-9-1998

# Rossi v. Standard Roofing Inc (Part II)

Precedential or Non-Precedential:

Docket 97-5185

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Rossi v. Standard Roofing Inc (Part II)" (1998). *1998 Decisions.* Paper 225.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/225

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 9, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 97-5185

JOSEPH ROSSI; ROSSI FLORENCE, CORP.;
ROSSI ROOFING, INC.,
Appellants

v.

STANDARD ROOFING, INC.; ARZEE ROOFING SUPPLY
CORP.; GAF CORPORATION; ALLIED ROOFING, INC.;
SERVISTAR CORP.; ROBERT HIGGINSON; HARDWARE
WHOLESALERS, INC.; WILLIAM HIGGINSON;
CERTAINTEED CORP.; WOLVERINE CORP.; NAILITE
CORP.; ESTATE OF ROBERT HIGGINSON; AL ROTH;
CARY ROTH; JOSEPH LICCIARDELLO; WOOD FIBRE
INDUSTRIES, INC.

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civ. No. 92-cv-05377)

Argued: November 6, 1997

Before: BECKER, ROTH, Circuit Judges and
DIAMOND, District Judge.*

(Filed September 9, 1998)

_____

* Honorable Gustave Diamond, United States District Judge for the
Western District of Pennsylvania, sitting by designation.

Finally, another former employee at Standard, Michael Hydro, testified that GAF comprised eighty percent of his sales while he worked there and at least five of Standard's customers purchased exclusively GAF product. He also explained that in 1989 and 1990, a large number of townhouse projects were already "spec'd" with GAF product, which made it impossible for the roofers to switch product lines mid-stream. Thus, anyone who could not supply GAF product was effectively barred from bidding for these jobs. On the basis of all of this evidence, we believe that Rossi has demonstrated that a genuine issue of material fact exists as to whether GAF product was special, and necessary for a distributor like Rossi to successfully compete in northern New Jersey.

Against this background on the roofing market in general and GAF 's place in the market in particular, we move to the evidence Rossi adduced that GAF used secret rebates with several of its biggest distributors in northern New Jersey, including Standard, Arzee, and Allied, for that is critical to understanding the motivations of Rossi's horizontal competitors. Pursuant to this scheme, GAF provided these distributors off-invoice, non-volume discounts on their purchases. These "rebates," assuming they were only offered to a few favored distributors as Rossi contends, allowed those distributors to sell GAF product at or below the prevailing market price (as set by the distributors who did not receive the discounts) while secretly conspiring to pocket the difference. In GAF district sales manager Bud Krusa's words, "the less [sic] people [who] knew about it [the discounts], the less chance you [the smaller distributors] have of getting it[and] dropping the entire market price." The most favorable inference we can draw for Rossi from Krusa's statement is that if these highly secret rebates became widely known, the smaller distributors who were not receiving rebates would have put pressure on GAF to receive equal treatment, and that this shakeup of the market could ultimately destabilize prices, lead to a price war, and "drop[ ] the entire market price" for GAF product.

By adducing evidence of the GAF rebate scheme and the importance of GAF and GAF product, Rossi transforms

42

what might otherwise have been a very difficult (and implausible) conspiracy into a realistic opportunity for a few cooperating competitors to fix prices and earn substantial profits while still operating within what appears to be a competitive marketplace. Cf. Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 239 (1993) (holding that a conspiracy to fix supra-competitive prices in a market with many variables was implausible because of the complexity required to monitor and enforce it) (citations omitted).

We find this case, as it relates to GAF, Standard, and Arzee, fundamentally unlike Matsushita. There, the critical problem with the conspiracy as alleged was that the conspirators had been losing large sums of money over a period of twenty plus years by undercutting the market in the hope of building market share and eventually establishing a monopoly. Not only did the Courtfind it difficult to distinguish the allegedly predatory pricing strategy from actual price competition, but given the extremely low chance that the scheme would succeed, the Court concluded that the defendants, if they operated in a rational manner, had no motive to engage in the conduct with which they were charged. In contrast, it is not difficult to divine the likely motive of the three distributors, Standard, Arzee, and Allied, in boycotting Rossi. As Rossi's horizontal competitors, they wanted to rid the market of a price-cutting competitor with a reputation for excellent service and reliability who had refused to cooperate in their price-fixing schemes in the past. Moreover, Rossi is aided in asking us to permit the fact finder to draw this inference by the strong likelihood that the boycott would actually succeed (as evidenced by the results).

Even if all of this is true, submits GAF, it still does not explain why it would make sense for GAF to join the conspiracy. We agree that GAF 's motive, as the manufacturer-supplier, is less obvious than Standard's or Arzee's, but ultimately we find it no less compelling. This is because Rossi has adduced evidence that Standard, Arzee, and Allied possessed substantial economic leverage over GAF. Together, they purchased $10.7 million of the $24.1 million of GAF product sold in New Jersey in 1989, or

44.5% of GAF 's total northern New Jersey sales. These distributors were not happy about the prospects of Rossi entering the market and competing with them, and they made their views known to GAF. Complaints and threats from three of GAF's largest customers in New Jersey are sufficient to establish a rational motive for GAF to engage in the concerted conduct that Rossi alleges. For these reasons, we do not accept GAF's submission that Rossi's conspiracy theory, and the economic motivations behind it, are inherently implausible.

### (2) Circumstantial Evidence Against GAF

We turn next to the circumstantial evidence that supports Rossi's allegations that GAF joined with Standard and Arzee (and potentially others) to enforce a market-wide boycott of first Rossi Florence and later Rossi Roofing, The evidence comes in several forms. First, as we will detail, Rossi has adduced evidence that GAF received numerous complaints about Rossi's pricing practices while he was at Standard and responded to them by asking Rossi to raise his resale prices on GAF product. While these complaints antedate Rossi entering the marketplace, they are useful background information to establish motive and practice. See Big Apple BMW, 974 F.2d at 1360-61.

Second, GAF participated in the group boycott against Rossi through monitoring and enforcement activities and the implementation of an unprecedented anti-trans-shipment policy. Third, there is evidence that GAF singled out Rossi and acted contrary to its own corporate policy in refusing to deal with him (an important factor under Monsanto and Matsushita), in that GAF employees testified that the company had an "open distribution" policy under which they sold to all comers, yet GAF refused to sell to Rossi and went to considerable lengths to see that he was not able to secure GAF product from other sources. Finally, Rossi has also adduced evidence that two of GAF 's explanations why it refused to deal with him -- that it had adequate distribution in New Jersey and product shortage -- were pretextual.

44

(a) Distributors' Complaints and GAF's Response

While Rossi worked at Standard, the company received, as did Arzee and Allied, the off-invoice, non-volume rebates discussed supra. Rossi used these rebates to reduce the prices he charged to his customers in an effort to increase sales volume; he did not, as his competitors did, retain the rebates to increase gross profits. This aggressive price-cutting strategy understandably angered Standard's competitors, and several of them complained to GAF about Rossi's behavior. Krusa and Licciardello, both then working as GAF district sales managers in the New Jersey region, frequently called Rossi at Standard and passed along the complaints of Arzee, Allied, Passaic Metals and others about Rossi's pricing. Krusa and Licciardello also called Bob Schaab, the Controller of Standard, to complain that Rossi was passing on the discounts given by GAF to Standard to his customers.

Although GAF did not have suggested resale prices, Krusa and Licciardello told Rossi to raise his resale prices for GAF product. Schaab, relaying GAF's messages, also asked Rossi to refrain from passing the GAF rebates to Standard's customers. Rossi refused, and vowed to price as he saw fit. This evidence suggests several things. First, it reaffirms the motives of Rossi's horizontal competitors, Arzee and to a lesser extent Standard. Second, it shows that a group of distributors (even a group that did not include Standard) could wield economic leverage over GAF and influence its interactions with recalcitrant distributors. Third, it suggests that GAF's course of conduct was to curry favor with its larger distributors by doing what it could to assist them in stabilizing the market and keeping price levels up.

We agree with GAF that evidence that it succumbed to pressure from distributors is not sufficient, by itself, to survive summary judgment, since the evidence of complaints and threats GAF received from Standard and Arzee is not enough in isolation to prove concerted action. See Monsanto, 465 U.S. at 763-64 ("[p]ermitting an agreement to be inferred merely from the existence of complaints, or even from the fact that termination came about `in response to' complaints, could deter or penalize

45

perfectly legitimate conduct."); Sweeney, 637 F.2d at 111. However, we do not rely solely on these complaints. Rather, there is a substantial amount of additional evidence to support a finding of an unlawful conspiracy. In this circumstance, we are permitted to consider the evidence of distributor complaints. See Monsanto, 465 U.S. at 764 n.8 ("We do not suggest that evidence of complaints has no probative value at all, but only that the burden remains on the antitrust plaintiff to introduce additional evidence sufficient to support a finding of an unlawful contract, combination, or conspiracy.").

            (b) Actions in Contravention of GAF Corporate
        Policy

GAF's boycott against Rossi appears to be contrary to its own corporate policy, particularly in light of the evidence adduced of GAF's draconian enforcement and anti-trans-shipment activities. There is testimony in the record that GAF had an open distribution system. Peter Bacchione, GAF 's director of marketing and sales and Krusa's superior in 1989, testified that GAF never had a closed distribution network and never rejected a potential distributor because the local market was saturated. Bacchione testified:

> Q: Do you recall in 1989 whether GAF, with respect  to the roofing products that you had responsibility for, had any particular objectives with respect to increasing, decreasing, or otherwise, its distribution channel.
>
> A: . . . We always looked to increase our share of business with any distributor.
>
> Q: Did GAF have any exclusive distributors for roofing products while you were national sales director?
>
> A: No.
>
> * * *
>
> Q: Wasn't GAF's philosophy to have an open distribution network?
>
> * * *

46

A: Maybe it was -- maybe it was a philosophy. A
practice. Whether it was a philosophy that was up on
a wall some place, I don't recall that.

Q: Was it the practice?

A: Generally, we sold on an open basis. There were  no
exclusivities.14

This testimony directly contradicts GAF's litigation
position as stated by Krusa, who has maintained since
1989 that GAF refused to supply Rossi because it had
"adequate distribution."15 Krusa is also contradicted by
Lorraine Campbell, Ruth Rogers, Mary Lou Sperr and Bob
Tafaro, all of whom worked for Krusa, and all of whom
testified that Krusa never told them that GAF had adequate
distribution in New Jersey. Finally, Rossi submits that
Krusa is contradicted by the fact that GAF supplied 34 out
of the 39 distributors in northern New Jersey, and only
refused to sell to three distributors including Rossi Roofing.
On summary judgment, of course, we need not resolve this
dispute, but rather grant Rossi all favorable inferences.

### (c) Monitoring and Enforcement Activities

GAF, through Krusa and Licciardello, took still more
steps to ensure that Rossi did not get any GAF product. In
January 1989, when Droesch told Krusa that he planned to
buy GAF product through his Florence Corporation in Long

_____

14. Bacchione appears to contradict himself during his deposition. For
example, in reference to the decision whether to open up ABC as a
distributor after Rossi Roofing had gone out of business, Bacchione also
said: "The concern was not whether or not to open up another
distributor. The concern was whether or not we had adequate
distribution, I think was the subject at hand. I think we felt there was
adequate distribution. . . . There was not a valid reason to open up
another distributor [next door to Standard]." This contradictory
testimony leads to two possible conclusions, and on summary judgment,
we must accept the one most favorable to Rossi.

15. For example, Krusa allegedly told Droesch in January 1989 that GAF
would not sell to Rossi Florence in New Jersey because it had adequate
distribution. In July 1989, when Krusa prevented Rossi from picking up
an order of GAF product from HWI, Rossi spoke with Krusa who told
him, "The distribution is filled. GAF requires no other distributors."

47

Island and resell it to Rossi Florence, Krusa told Droesch that "he would not allow that and he would not sell me [sic] in Long Island if I did that." GAF also warned other distributors not to resell its products to Rossi, and there is evidence that, on at least one occasion, GAF took steps to enforce its boycott. GAF salesmen Sal Granfort and Doug Collins warned DiNaso & Sons, a roofing and siding distributor located in Staten Island, New York, not to resell its product to Rossi. After DiNaso & Sons ignored their warnings, GAF raised DiNaso's prices by $1.00/unit, arguably in retaliation. Similarly, when Rossi contacted Stroeber Supply, another northern New Jersey distributor, to see if it would sell GAF product to him, Larry Hammershock of Stroeber told a Rossi Roofing employee that Stroeber had already been told by GAF not to sell GAF product to Rossi Roofing. Hammershock defied GAF and sold to Rossi Roofing anyway, but at a higher price.

There is also evidence that GAF extended the boycott to buying groups like HWI and Servistar which Rossi began to use, in addition to distributors like Stroeber and DiNaso, to try to circumvent the GAF boycott.[16] To this end, Rossi

---

16. Rossi contests the district court's affirmance of an order by the magistrate judge, denying his motion to compel GAF to disclose the names of the entity or entities that were the subject matter of certain conversations between GAF 's in-house counsel Robert Poyourow and Krusa on July 27, 1989, August 10, 1989, and January 6, 1990. Rossi hypothesizes that several of these discussions centered around HWI and Servistar, and he submits that the district court abused its discretion when it accepted GAF's description of the "subject matter" of these conversations on its privilege log as "absence of a legal obligation to sell
product." We conclude, however, that the district court did not abuse its discretion by denying Rossi's motion to compel the name of the entity discussed or any other additional information concerning the "subject matter" of the conversation catalogued in GAF's privilege log. See Rabushka v. United States, 122 F.3d 559, 565 (8th Cir. 1997) (standard of review), cert. denied, Rabushka ex rel. United States v. Crane Co., 118 S. Ct. 1336 (1998). Rule 26(b)(5) only requires that a party claiming a privilege "describe the nature of the documents, communications, or things not produced or disclosed in a manner that . . . will enable other parties to assess the applicability of the privilege or protection." Fed. R.
Civ. Pro. 26(b)(5). These matters are generally best left to the district and
magistrate courts' discretion. In the circumstances that exist here, we will not second guess the courts' conclusion that the description provided was adequate to support the privilege claim.

joined HWI in July 1989 and placed an order for GAF product. Membership in HWI ordinarily should have allowed Rossi to purchase products from all of HWI's suppliers, including GAF. Likewise, GAF normally supplied its products to all HWI members, regardless of whether they appeared on GAF's own customer list. Notwithstanding this, when a Rossi Roofing driver went to GAF's facility on July 27, 1989, to pick up the GAF product ordered through HWI, GAF would not release it. After several hours of wrangling over the order, Rossi eventually spoke with Krusa, who had given the order not to release the GAF product. Krusa told Rossi "I am not selling to you. The distribution is filled. GAF requires no other distributors." Rossi replied that GAF was not really selling to Rossi Roofing, but rather to HWI, to which Krusa responded, "We are not selling to you." After this dramatic exchange, Dave Heine of HWI remarked that he had never seen anything like this in his ten years working at the buying group. App. at 2596, 3513.

In yet another effort to obtain GAF product and circumvent the boycott, Rossi used Far Hills Lumber and Hardware ("Far Hills"), a start-up hardware store of which he was a principal, to place orders through the buying group Servistar. See supra S II.B.2.a and infra S II.B.2.c. Rossi was able to purchase one order of $30,000 worth of GAF product on August 2 and 3, 1989. However, after GAF and Standard found out that Rossi had used Far Hills and Servistar to get GAF product, see infra S II.B.2.c, GAF refused to fill Far Hills' second order for $456 of GAF product.

Rossi has also adduced evidence that GAF and Standard coordinated to ensure that Rossi was not getting any GAF product. See supra S II.B.2.a. Rossi developed evidence that Licciardello of Standard confirmed with Gessner of GAF that GAF was not selling to Rossi, and there is evidence that, after seeing GAF product in front of Rossi Roofing, Licciardello called and was reassured by GAF that the load was not for Rossi but bound for Walmart on a Jentar truck. See id. In addition, there is the statement made by Licciardello after he learned that Rossi Roofing had been getting GAF product through Far Hills and Servistar that

49

" `that's the last time we're going to be seeing any GAF across the street.' They got the -- they were getting the loads through [Far Hills], which is [Servistar]. That's how Joe Rossi was getting GAF and he's [Licciardello] going to put an end to that. `Never going to see another GAF load across the street.' " See supra S II.B.2.a.

### (d) Pretextual Excuses

Finally, Rossi argues that GAF used pretextual excuses to explain why it refused to supply Rossi, and that this use of pretext is further circumstantial evidence of the conspiracy he alleges. See Fragale, 760 F.2d at 474 (pretextual excuses are circumstantial evidence that can disprove the likelihood of independent action). The first excuse is that Rossi was not needed because GAF had adequate distribution. Rossi notes that, despite Krusa's contention that everyone in his office knew that he had "adequate distribution" in New Jersey, neither his boss, Peter Bacchione, nor his employees, Lorraine Campbell, Ruth Rogers, Mary Lou Sperr, and Bob Tafaro had ever heard of this policy. Even Krusa admits that GAF had never refused to fill an order through a buying group like Servistar because its distribution was allegedly full.

This "adequate distribution" excuse is just the "flip side" of Rossi's contention that GAF was acting in contravention of its open distribution policy, and for the same reasons that there is a genuine issue whether GAF 's policy was to supply all distributors who wished to purchase its products, there is also a genuine issue of material fact whether the "adequate distribution" justification Krusa gave to Rossi was legitimate or simply pretextual. We note again that GAF supplied its roofing product to at least 34 of the 39 distributors in the northern New Jersey marketplace, but not to Rossi.

GAF's second excuse, which Rossi submits was also pretextual, was that GAF had a product shortage and therefore could not supply any new distributors. Rossi contends that there is a genuine issue of material fact as to the validity of this excuse because Bacchione, GAF's national sales manager, testified that he could recall no

50

problems in filling customer orders for GAF product in 1989, despite the fact that this would have been a matter within his job responsibilities. In addition, Rossi argues that the only document GAF has been able to produce to corroborate Krusa's claim that GAF product was in short supply in 1988 and 1989 was a memorandum dated August 11, 1989. Rossi submits that this memorandum should not be considered conclusive for the purposes of summary judgment because it was written almost nine months after GAF had decided not to supply Rossi Florence. GAF counters that the memorandum refers to the product shortage as a "continuing" issue, and therefore that summary judgment is appropriate.

The critical language in the memorandum is:

> We continue to have an im-balance of inventory between Baltimore and So. Bound Brook. The lack of warehousing has been a very critical issue, causing the im-balance in inventory.

> We are receiving more calls, on a daily basis, from customers in the southern half of the district complaining of our lack of product and the congestion of trucks and also the length of time it takes to get loaded at the Baltimore Plant.

Our reading of the document is that it is ambiguous and therefore insufficient to command summary judgment. For example, it is unclear whether the memorandum refers to an overall GAF product shortage or just a warehousing "im-balance" that was temporarily interfering with delivery to the southern half of Krusa's territory. Also, while the memorandum refers to the problem as a "continuing" one, there is no indication what that means. On summary judgment, viewing the evidence in a light most favorable to Rossi, he has established a genuine issue of fact whether both the "adequate distribution" and the "product shortage" excuses were pretextual.

### (e) Conclusion

To summarize, we find that Rossi has adduced competent evidence that GAF: (1) responded to distributor complaints

51

in the past; (2) singled out Rossi as one of the few distributors out of a large number in northern New Jersey not to receive GAF product; (3) acted in contravention of its own established open distribution policy in dealing with Rossi; (4) threatened and punished distributors who resold to Rossi; (5) refused to supply Rossi through buying groups; (6) implemented an unprecedented policy prohibiting trans-shipment of GAF product to Rossi; (7) cooperated with Standard in monitoring and enforcing the boycott; and (8) offered pretextual excuses to explain its behavior. Examining the totality of this evidence, it is sufficient to support a reasonable inference that GAF was acting in concert with Standard and Arzee to boycott Rossi.

Particularly forceful is the evidence that GAF prohibited distributors from trans-shipping GAF product to Rossi and that GAF prevented Rossi from purchasing its products from buying groups. These actions simply do not make sense in light of GAF's asserted justifications for its behavior vis a vis Rossi. For example, if there were truly a product shortage in northern New Jersey, presumably GAF would then have cut off supply to all Servistar and HWI members who were not on GAF's approved customer list to ensure that its larger distributors like Standard and Arzee would not suffer from the short supply. Yet, GAF supplied Far Hills, also an entity that was not on GAF's customer list, until it discovered that Far Hills was under Rossi's control. Moreover, the product shortage excuse is not consistent with GAF's claim that it unilaterally implemented a policy precluding trans-shipment of product at the distributor level. Assuming that GAF product was scarce, GAF would understandably want to ensure that its favored distributors received it ahead of all others. However, once GAF decided how it would allocate among its approved distributors whatever amount of GAF product existed, it is difficult to conceive of a legitimate reason why GAF would care whether that distributor used the product or resold it to Rossi Roofing at a profit.

Additionally, the product shortage justification does not explain why GAF would sell Droesch as much GAF product as he wanted in Long Island but would not allow him to trans-ship that product to New Jersey. Similarly, it is hard

52

to comprehend why GAF would continue to fill $30,000 orders, obviously commercial-sized purchases, to buying group members in northern New Jersey, if it was truly believed that it had adequate distribution in that market. One explanation of this behavior is that GAF was acting in concert with Standard, Arzee, and Allied to boycott Rossi and force him out of business.

For the reasons described above, Rossi has met his burden of adducing evidence that tends to exclude the possibility of independent action, and hence we will reverse the district court's order granting summary judgment in favor of GAF.

### c. Servistar

In contrast to the defendants discussed above, we will affirm the district court's grant of summary judgment in favor of Servistar because Rossi has failed to introduce either direct or circumstantial evidence that tends to exclude the possibility that Servistar acted independently rather than joining the conspiracy against Rossi.

Servistar's involvement in this case stems from its refusal to honor Rossi's second purchase request for $456 of GAF product on August 11, 1989. Rossi had already obtained a little over $30,000 of GAF product on August 8 and 9, 1989, via his Far Hills account with Servistar, which was resold to Rossi Roofing. Two days later, when Rossi attempted to order a second batch, Servistar did notfill it, claiming that GAF had cut Far Hills off from obtaining GAF product. Rossi contends that after he received thefirst order of GAF product, Standard and Arzee discovered how he had circumvented the blockade, notified GAF, and that GAF then enlisted Servistar to join the group boycott and cut off this new avenue of supply. Rossi offers three pieces of evidence to support this allegation: (1) a discussion he had with Jim Cherbonneau of Servistar in which Cherbonneau told him that GAF did not want Servistar to ship its product to Rossi and that GAF would not supply Rossi through his Servistar account;17  (2) Servistar's

_____

17. Cherbonneau told Rossi, "GAF called, they knew where the product was going. They had filled their needs in that area, and [ ] they do not want us to ship to you."

curious and sudden change of mind, selling Rossi $30,000 of GAF product one day and refusing a minuscule $456 order two days later; and (3) Servistar's use of the allegedly pretextual excuse that Far Hills had credit problems to justify its refusal to deal.

Rossi's only direct evidence, the phone conversation with Cherbonneau, is not evidence of Servistar's conspiratorial involvement. Cherbonneau said that "GAF would not sell product to Servistar to go to -- through [Far Hills] to me." Cherbonneau's statement, while not precluding concerted action, is evidence only of a unilateral decision by GAF to not supply Rossi through any means (or a multilateral conspiracy that did not include Servistar). Additionally, it is undisputed that Servistar could not force GAF to supply it or its members with GAF product. Unlike other products Servistar supplied, Servistar neither stored GAF product in its warehouses nor had the contractual right to compel GAF to supply the product. The Servistar-GAF purchasing agreement did not obligate GAF to accept all of Servistar's members' orders.

Because Servistar provided GAF product to its members on what is known in the industry as a "drop shipment" basis, it had no control over whether its suppliers would actually deliver their products to its members. The "drop shipment" relationship between Servistar and GAF meant that when a Servistar member placed an order with Servistar for GAF product, Servistar would forward that order to GAF. The member would then go to the GAF warehouse to pick up the GAF product directly from GAF, not Servistar. GAF then would invoice Servistar for the purchase, and Servistar would pay GAF. Subsequently, Servistar would collect the amount due from its member. Using this "drop shipment" purchasing method, Servistar assists its members by: (1) negotiating group discounts from manufacturers, and (2) acting as the guarantor of its members' credit to those manufacturers. Thus, Servistar's role did not include pre-purchasing and warehousing of GAF product, and it had virtually no say over which of its members GAF chose to supply.

Under these circumstances, Rossi's claim that "at the request of GAF, Servistar refused to fill Far Hills' next order

54

for $450 because Far Hills had resold it to Rossi Roofing," is not supported by Rossi's own testimony. As described above, according to the undisputed evidence, GAF did not have to conspire with Servistar to boycott Rossi Roofing because GAF did not need Servistar's acquiescence to prohibit Far Hills or Rossi Roofing from buying its product through Servistar. Since there is no evidence that Servistar could overrule a unilateral GAF decision to refuse to supply a Servistar member, we cannot reasonably infer on the basis of such ambiguous evidence that Servistar and GAF agreed to refuse to sell to Far Hills. See International Logistics Group Ltd. v. Chrysler Corp., 884 F.2d 904, 907 (6th Cir. 1989) (no credible conspiracy is alleged where a manufacturer imposing distribution restraints does not need agreement or acquiescence from its distributors in formulating marketing conditions for its product); 6 Phillip E. Areeda, Antitrust Law P 1402b4 (1986) ("discussions, suggestions, recommendations, and the giving of information do not indicate any conspiracy where the actor imposing the alleged restraint does not wish or need the acquiescence of the other party or any quid pro quo from him").

Similarly, Rossi's allegation that Servistar made no effort to require GAF to fill the order of its member Far Hills does not support his theory of conspiracy. Without direct evidence (or other strong circumstantial evidence) of concerted action by Servistar and GAF, we cannot draw an inference of an unlawful conspiracy from the equivocal nature of Servistar's decision not to make what would most likely have been a futile effort to encourage GAF to sell to Rossi. Servistar's refusal to disrupt its relationship with GAF because GAF unilaterally (from Servistar's perspective) refused to deal with Rossi is clearly "as consistent with permissible competition as with illegal conspiracy," Matsushita, 475 U.S. at 588 (citations omitted), and is not evidence of a "conscious commitment to a common scheme." Monsanto, 465 U.S. at 764. We note in this regard that there is no evidence that Servistar was on notice that GAF was part of a conspiracy to boycott Rossi Roofing. Thus, from Servistar's point of view, this was simply a unilateral refusal to deal. Indeed, even if Servistar did know that GAF was involved in an unlawful group boycott, its

55

decision to continue relations with GAF would still not rise to the level of concerted action.

Without direct evidence with respect to Servistar, we must also consider whether Rossi's conspiracy theory is plausible, and whether inferring concerted action under these circumstances would have the effect of deterring significant procompetitive conduct. See Petruzzi's, 998 F.2d at 1233. Both of these considerations militate against inferring concerted action with respect to Servistar. Apart from the evidence discussed above that it would be unreasonable to infer that Servistar would conspire with GAF to do what GAF could do unilaterally (i.e. refuse to release GAF product to Rossi from GAF warehouses), it is similarly implausible that GAF, an extremely minor Servistar supplier, could "pressure" Servistar, a billion plus dollar buying cooperative, into joining the group boycott of Rossi Roofing, a small start-up roofing and siding distributor. Similarly, Rossi has adduced no evidence of a motive for Servistar to join the conspiracy. See Matsushita, 475 U.S. at 596-97. Nothing in the record indicates that Servistar had any reason to support a conspiracy to increase or stabilize wholesale roofing prices in New Jersey, and, to repeat, there is simply no evidence of GAF leverage over Servistar.18

Perhaps most importantly, inferring a conspiracy from the slim circumstantial evidence would have the effect of deterring Servistar's significant procompetitive conduct in this as well as many other markets. As a wholesale purchasing cooperative, Servistar bolsters competition and increases economic efficiency by aggregating small purchasers thereby permitting them "to achieve economies of scale in both the purchase and warehousing of wholesale supplies, and also ensur[ing] ready access to a stock of goods that might otherwise be unavailable on short notice. The cost savings and order-filling guarantees enable smaller retailers to reduce prices and maintain their retail stock so

_____

18. Sales of GAF product through Servistar, estimated at about $2.5 million, comprised only 12% of Servistar's total roofing purchases on behalf of its members and an insignificant fraction of Servistar's one billion plus national purchases in 1989.

56

as to compete more effectively with larger retailers." Northwest Wholesale Stationers, 472 U.S. at 295. If we were to permit an antitrust violation to be inferred under the facts of this case, it would significantly impact the ability of Servistar to continue its procompetitive actions in the market.

Because Servistar could not compel GAF to sell to Far Hills, Servistar's only option in response to GAF's decision not to supply Far Hills would have been to somehow bring pressure to bear on the roofing manufacturer. Such action would undoubtedly adversely affect all Servistar members nationwide who were receiving improved pricing for GAF product through Servistar, especially if it led to the restriction or cessation of Servistar's purchasing agreement with GAF. Indeed, inferring concerted action in these circumstances could encourage Servistar to terminate relationships with every supplier that refused to sell to a particular Servistar member. This would deter Servistar's procompetitive activities and deny Servistar's members the significant benefits of cooperative membership.

Finally, Rossi submits that Servistar offered a pretextual excuse to explain its decision not to supply Far Hills with GAF product. Pretextual excuses, as noted, can disprove the likelihood of independent action. See Fragale, 760 F.2d at 474. Rossi challenges Servistar's explanation that it refused to supply the second order of GAF product to Far Hills because of Far Hills' credit problems. Although it appears that there are genuine issues of fact concerning Far Hills' credit-worthiness and its impact on Servistar's decision to refuse Rossi's second order of GAF product,19 considering Servistar's lack of motive to conspire, GAF's lack of any leverage over Servistar, and the fact that GAF did not need to enlist Servistar's help to boycott Rossi, this

_____

19. On the one hand, the record indicates that Servistar refused Far Hills credit on August 15, 1989, even though Far Hills had only used $30,755 of its outstanding $75,000 credit limit and no payments were yet due. On the other hand, Servistar contends that it extended the $75,000 credit limit to Far Hills for the purpose of funding hardware purchases, not roofing supplies. According to Servistar's forceful rejoinder, the initial
order of $30,755 was an error, and after it was discovered, Servistar unilaterally determined not to permit it to happen again.

57

slim reed of pretext is simply not enough. In view of the procompetitive role Servistar plays in the market generally and concerned that we do not "chill the very conduct the antitrust laws are designed to protect," Matsushita, 475 U.S. at 594, we conclude that Rossi has not met his burden here in opposing summary judgment, and therefore we will affirm the district court's order granting summary judgment in favor of Servistar.

### d. Wood Fiber

Like GAF, Wood Fiber manufactures roofing products, including Structodek FS, which is widely used in certain commercial roofing applications. Unlike GAF, however, Wood Fiber is only tangentially involved in the alleged conspiracy with its activity centering around a single incident in which Rossi was frustrated in his attempt to purchase approximately $5,000 worth of Structodek FS. We will affirm the district court's grant of summary judgment in favor of Wood Fiber because, as with Servistar, Rossi has failed to introduce evidence that tends to exclude the possibility that Wood Fiber acted independently rather than joining the conspiracy against Rossi.

On June 6, 1989, Rossi Roofing ordered Structodek FS from Wood Fiber for its customer, Star Roofing. Wood Fiber quoted a price and a shipping date of July 5th to Rossi Roofing. On June 27, 1989, Karl Loser, Wood Fiber's sales representative in New Jersey, called and told Rossi Roofing's Mike Issler that Wood Fiber would notfill the order. As a result, Rossi Roofing lost the order for Structodek FS from Star Roofing. Rossi claims that Loser told him that Wood Fiber was being pressured by Standard and Arzee not to sell to him and that there was a"problem" with his pricing. Loser also told Issler that Wood Fiber had previously sold product to a small distributor on Long Island and suffered when Allied canceled orders in retaliation. Loser testified that he wanted to supply Rossi Roofing, but that his concerns that Rossi Roofing's competitors would retaliate "influenced" his decision not to supply Rossi Roofing.

Based upon these facts, Rossi asks us to infer that Wood Fiber participated in a conspiracy to boycott Rossi Roofing

because it gave in to pressure and fear of retaliation by several of its distributors. It is well established that this kind of evidence, by itself, is legally insufficient to prove a conspiracy. See Monsanto, 465 U.S. at 763-64; Sweeney, 637 F.2d at 111. In Sweeney, the plaintiffs contended that "the retailers' acts of complaining and [the defendant's] reaction to the complaints constituted concerted action in restraint of trade." Sweeney, 637 F.2d at 110. We rejected that argument and noted that "even if the appellants had demonstrated that [the defendant's] actions were in response to these complaints, such evidence alone would not show the necessary concerted action." Id. Similarly, in Monsanto, the Supreme Court opined that "[p]ermitting an agreement to be inferred merely from the existence of complaints, or even from the fact that termination came about `in response to' complaints, could deter or penalize perfectly legitimate conduct." 465 U.S. at 763. Thus, the Court held that " `[t]o permit the inference of concerted action on the basis of receiving complaints alone and thus to expose the defendant to treble damage liability would both inhibit management's exercise of independent business judgment and emasculate the terms of the statute.' " Id. at 764 (quoting Sweeney, 637 F.2d at 111 n.2).

We have explained at length supra why the claims against Standard, Arzee, and GAF survive, notwithstanding these precedents. However, because Rossi has not adduced evidence of anything other than the fact that Wood Fiber may have responded to pressure and threats from Standard and Arzee, we cannot infer the existence of concerted action involving Wood Fiber. The evidence adduced against Wood Fiber stands in stark contrast to the evidence against GAF. For example, Rossi has not adduced any evidence that Wood Fiber offered pretextual excuses, or prohibited trans-shipment of its product, or engaged in monitoring and enforcement of the alleged boycott. Without some additional evidence, a fact finder may not infer that Wood Fiber entered into an agreement to boycott Rossi Florence or Rossi Roofing, and therefore we will affirm the district court's order granting summary judgment in favor of Wood Fiber.

59

III. PROXIMATE CAUSE AND ANTITRUST INJURY

Having determined that Rossi has adduced sufficient evidence of a conspiracy to satisfy the first prong of the prima facie case with respect to the Standard defendants, the Arzee defendants, and GAF, we now consider whether Rossi has adduced sufficient evidence to satisfy the fourth prong, "that the plaintiffs were injured as a proximate result of that conspiracy." Tunis Bros., 763 F.2d at 1489.[20]

The district court concluded that even if Rossi had established the existence of an agreement, his claim still would fail because he had not established that the business losses he suffered were in any way related to that conspiracy. See Rossi v. Standard Roofing, Inc., 958 F. Supp. 976, 991 (D.N.J. 1997). The court determined that Rossi's allegations -- that the defendants prevented him from obtaining GAF and other roofing products he needed to compete and thereby stopped him from opening Rossi Florence and ultimately forced Rossi Roofing out of business -- are unsupported in the record. The district court also concluded that Rossi's damages expert, Regan R. Rockhill, CPA, based his report upon unfounded assumptions that would force a trier of fact to use "guesswork and speculation" in determining what, if any, injury Rossi suffered as a result of the defendants' actions. See id. The court criticized the Rockhill Report for being nothing more than an impermissible "but for" damage model that erroneously ignored several important factors, including failing: (1) to consider that Rossi had no experience running his own business; (2) to analyze specifically what products were needed to assure a successful distributorship; and (3) to engage in any analysis of what harm, if any, was caused by the alleged antitrust violations as opposed to other factors, such as Rossi's management style or general business conditions. See id.

The district court accordingly held that Rossi had not presented sufficient evidence of damages such that a

_____

20. As explained above, because Rossi's allegations qualify for per se treatment, the second and third prongs of the four-part antitrust prima facie case are conclusively presumed. See supra S II.A.

reasonable inference could be made connecting the injury with the defendants' conduct. For the reasons we will explain, we disagree with the court's conclusion that Rossi has not identified a genuine issue of material fact with regard to the proximate cause and damages element of his prima facie case.

To recover damages, an antitrust plaintiff must prove causation, described in our jurisprudence as "fact of damage or injury." See Danny Kresky Enters. Corp. v. Magid, 716 F.2d 206, 209 (3d Cir. 1983). It is not necessary to show with total certainty the amount of damages sustained, just that the antitrust violation caused the antitrust injury suffered by the plaintiff. See Amerinet, Inc. v. Xerox Corp., 972 F.2d 1483, 1493 (8th Cir. 1992); Danny Kresky, 716 F.2d at 211 ("the standard of causation requires only that plaintiff prove that defendant's illegal conduct was a material cause of its injury"). As the Supreme Court explained in Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 114 n.9 (1968) (citations omitted) (emphasis in original):

> [Plaintiff's] burden of proving the fact of damage under S 4 of the Clayton Act is satisfied by its proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damages. It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under S 4.

Once causation is established, the jury is permitted to calculate the actual damages suffered using a " `reasonable estimate, as long as the jury verdict is not the product of speculation or guess work.' " In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1176 (3d Cir. 1993) (citing MCI Communications Corp. v. American Tel. & Tel. Co., 708 F.2d 1081, 1161 (7th Cir. 1983)) (other citations omitted). Thus, in antitrust cases, there are ultimately two related, but distinct, inquiries to establish antitrust injury. First, the plaintiff must prove the fact of antitrust injury, as part of his prima facie case; then, he must make a showing regarding the amount of damages, in order to justify an

61

award by the trier of fact. Concerning the former, courts apply the ordinary standard of proof, but with respect to the latter, the standard is somewhat relaxed. See In re Lower Lake Erie Iron Ore, 998 F.2d at 1176 ("[t]he relaxed measure of proof is afforded to the amount, not the causation of loss -- the nexus between the defendant's illegal activity and the injuries suffered must be reasonably proven.") (citations omitted); see also Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264-65 (1946) (holding that when the plaintiff cannot prove his damages by precise computation, the jury "may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly").

Under these standards, Rossi's antitrust claim does not suffer from the infirmities claimed by the district court. At the threshold, it is important to note that we need only concern ourselves with the first element of antitrust injury, causation. At this procedural juncture, reviewing the district court's grant of the defendants' motions for summary judgment, we are not, as we would be upon reviewing a jury verdict, determining whether a plaintiff has brought forth sufficient evidence to justify the actual damages awarded. Rather, here, all we are concerned with is whether Rossi has established that the defendants' "illegal conduct was a material cause of [his] injury." Danny Kresky, 716 F.2d at 211; see also Zenith Radio, 395 U.S. at 114 n.9.

We find two sources of evidence sufficient for Rossi to demonstrate fact of injury or causation: (1) evidence of specific lost transactions based upon Rossi's inability to purchase product; and (2) the Rockhill Damage Report. We discuss these in turn.

We have already explained that there is ample evidence in the record that Standard, Arzee, and GAF conspired to deny Rossi access to GAF product and prevent him from competing in the roofing and siding business in northern New Jersey. See supra S II.B.2.a & b. Also, there is evidence that, with a few exceptions, the defendants successfully prevented Rossi from obtaining GAF product. See id. Moreover, there is evidence that GAF product was highly desirable, if not critical, to Rossi's target customers. See

supra S II.B.2.b(1). Finally, several of Rossi's former customers from his Standard days, including Sean Coffey, Francis Doherty, John Feher, Albert Logan, and Melvin Stanley, have testified that they would have done business with Rossi Roofing if he had had access to the necessary products, primarily GAF product.

This evidence is enough by itself to satisfy Rossi's burden on causation for the purposes of summary judgment. Rossi has put forth evidence that the defendants' alleged conspiracy unlawfully prevented him from obtaining GAF product, and that he lost multiple sales as a result. Thus, if Rossi can successfully prove the existence of the conspiracy, he will have proved fact of injury. The case before us is not analogous to Van Dyk Research Corp. v. Xerox Corp., 478 F. Supp. 1268 (D.N.J. 1979), a case upon which the district court relied, where the plaintiff failed to prove fact of injury primarily because it could not show that it lost even a single contract based upon the alleged unlawful practices of the defendant. See 478 F. Supp. at 1327.

In the same vein, Amerinet is not availing to the defendants either. In Amerinet, the Eighth Circuit concluded that the plaintiff had not shown antitrust injury or causation in large part because statements and assertions by its own damage expert "strongly suggest[ed] . . . that [plaintiff's] decline was caused at least partly by, if not substantially or mainly by, other factors than [defendant's] alleged antitrust violations." Amerinet, 972 F.2d at 1495 (noting that the plaintiff's damage expert admitted that the plaintiff was in a period of decline prior to the defendant's alleged antitrust violations). In addition, the plaintiff in Amerinet was only able to show that, at most, the allegedly illegal activity was "one factor among many, and not a controlling or major factor" in specific potential clients' decisions not to purchase from the plaintiff. Id. at 1497. Therefore, the Eighth Circuit held that the plaintiff had not adduced sufficient evidence of element of causation to enable it to withstand summary judgment.

Here, Rossi's evidence is more substantial than in either Van Dyk Research or Amerinet. Rossi has proffered evidence from five specific customers that they would have

63

purchased GAF product from Rossi if he had been able to sell it to them, and Rossi's inability to consummate those sales (leading to a loss of business and therefore injury) is a direct result of the alleged antitrust violation-- the group boycott. In addition, Richard Droesch, Rossi's partner in the failed Rossi Florence venture, backed out of that venture at least in part based upon his understanding that the company would not be able to get the products it needed, particularly GAF product, to compete successfully in the market. For all these reasons, we believe that the record supports Rossi's allegations that he suffered antitrust injury, and that it was caused by the defendant's allegedly unlawful actions.

The district court also utterly rejected Rossi's damage expert, holding that his report was nothing more than a "but for" damage model that failed as a matter of law to support Rossi's damage allegations. We believe, however, that the Rockhill Report, when combined with the testimony concerning the five lost sales, is indicative of a larger pattern of loss and helps Rossi demonstrate causation. Thus, while the other damage evidence is enough alone to satisfy Rossi's summary judgment burden, for the guidance of the district court on remand, we nonetheless consider the Rockhill Report.

A typical "but for" damage model, like the one in Southern Pacific Com. Co. v. American Tel. & Tel. Co., 556 F. Supp. 825 (D.D.C. 1983), aggregates the defendant's alleged violations and creates a hypothetical calculation projecting the plaintiff's profits and losses "but for" the defendant's antitrust violations. In Van Dyk Research, for example, this estimate was based upon an internal "task force" report created by the plaintiff projecting its own future performance. See 478 F. Supp. at 1327. The plaintiff then compares this hypothetical figure with its actual performance to calculate its damages. Courts usually highlight two problems with models created using this methodology.

First, they do not attempt to measure the particularized effects of any specific alleged illegal practices, but rather rely on an aggregation of injury from all factors. See Southern Pacific, 556 F. Supp. at 1092. Second, their

64

hypothetical "but for" calculations usually rely upon unrealistic ex ante assumptions about the business environment, such as assumptions of perfect knowledge of future demand, future prices, and future costs that tend to overstate the plaintiff's damage claim. See id. at 1092–93 (pointing out many difficulties not caused by the defendants that negatively impacted plaintiff's profitability yet were not accounted for in the "but for" damage model). Thus, using a "but for" damage model arguably makes it impossible for the trier of fact to determine what, if any, injury derived from the defendant's antitrust violations as opposed to other factors, and courts sometimes reject such models as the basis of either causation or amount of injury. See Southern Pacific, 556 F. Supp. at 1090, 1098; Van Dyk Research, 478 F. Supp. at 1327.

The Rockhill Report is in many respects a "but for" damage model because it does not deal with the particularized effects of specific injuries, but rather aggregates all of Rossi's damages into one figure. Relying on Van Dyk Research and Southern Pacific, defendants argue that all "but for" models should be precluded as a matter of law from serving as a basis for antitrust causation and damage calculation. We do not agree with the defendants' reading of these cases (and, at all events, are not bound by them), which we conclude only stand for the proposition that some, not all, "but for" models are too speculative and must be precluded as a matter of law. The Rockhill Report, as we shall see, is much less speculative and does not suffer from many of the flaws in the damage models discussed in Van Dyk Research and Southern Pacific, and thus it is not comparable with them.

Rockhill made two major assumptions in calculating the damages Rossi suffered because of his inability to procure products. First, he estimated that Rossi Florence and/or Rossi Roofing would have achieved the same pattern of sales revenues (and revenue growth) beginning in 1989 and extending to 2008 that ABC's Morristown sales branch actually achieved from 1990–1993, operating out of the same location, with Rossi as branch manager. Rossi makes a strong argument that this estimate took into account the poor general business conditions that existed at the time,

as well as any other extrinsic factors not related to the defendants' alleged boycott, because Rockhill based his estimate upon actual sales figures Rossi was able to achieve competing against the same firms, selling the same products at the same location to the same customers under the actual business conditions that existed at the time.21 The second major assumption in the Rockhill Report is that Rossi would have been able to manage Rossi Florence and Rossi Roofing in the manner that he had run Standard's Morristown branch from 1974-1987. Rockhill used Standard's Morristown branch financial statements to develop 14-year averages for cost of sales, payroll expenses, equipment expenses, and administrative expenses (as a percentage of total sales) and applied them to the sales estimate. This kind of estimate, while perhaps not one upon which we would base our own personal investment decisions, nevertheless is sufficient to establish causation (especially when considered in conjunction with thefive lost transactions).22

(Text continued on page 68)

_____

21. Defendants also complain that it is inappropriate to use sales figures Rossi achieved working for ABC, a major national chain, to estimate the revenues that Rossi Florence or Rossi Roofing would have achieved without the boycott. This position has some force and is certainly an appropriate argument to advance before the trier of fact; however, it is not uncontroverted. There is ample evidence in the record that wholesale roofing and siding sales has a strong local accent, and that after price, service and reliability are the next most critical factors in customers' purchasing decisions. Rossi had a long track record in northern New Jersey, and several witnesses testified that they would patronize Rossi regardless of whom he worked for, as long as he carried the product they needed at a competitive price, because he provided the best service. Thus, it is not clearly evident that Rossi's salesfigures with ABC (or Standard) would necessarily be higher than with Rossi Roofing.
22. For the guidance of the district court on remand, we note that the Rockhill Report satisfies the relaxed Bigelow standard of proof for estimating the amount of damages under which:

    the jury [may] conclude as a matter of just and reasonable inference
    from the proof of defendants' wrongful acts and their tendency to
    injure plaintiffs' business, and from the evidence of the decline in
    prices, profits and values, not shown to be attributable to other
    causes, that defendants' wrongful acts had caused damage to the
    plaintiffs. . . . [When] [ ] tortious acts . . . preclude[ ] ascertainment

66

of the amount of damages more precisely, by comparison of profits, prices and values as affected by the conspiracy, with what they would have been in its absence under freely competitive conditions . . . we [have] held that the jury could return a verdict for the plaintiffs, even though damages could not be measured with the exactness which would otherwise have been possible.

In such a case, even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork. But the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. In such circumstances `juries are allowed to act on probable and inferential as well as [upon] direct and positive proof.' Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the

measure of damages uncertain.

Bigelow, 327 U.S. at 264 (internal citations omitted).

In Bigelow, the Supreme Court upheld a jury's damage award based upon a comparison of the plaintiff's actual profits with the contemporaneous profits of a competing theater with access to first-run films, which were illegally denied to plaintiff theater by a group of conspiring film distributors. See J. Truett Payne Co., Inc. v. Chrysler Motors Corp., 451 U.S. 557, 566 (1981) (explaining Bigelow). The Bigelow plaintiff had also adduced evidence comparing his actual profits during the conspiracy with his profits when he had been able to obtain first-run films. See id. This was enough to uphold the jury's verdict. Similarly, in Zenith Radio, the Supreme Court permitted the plaintiff, who had been the victim of an illegal campaign against importers attempting to bring new products into Canada, to estimate its damages by comparing its market share in the United States (where it competed freely) with its market share in Canada (where it was the target of unlawful distribution-disrupting tactics). See 395 U.S. at 116 n.11 & 124-25. Finally, we have held that "plaintiffs must be free to select their own damage theories as long as they are supported by a reasonable foundation." Danny Kresky, 716 F.2d at 213 (upholding a market share damage calculation approach in which the plaintiff argued that had it not been for the defendants' antitrust violations, it would have been able to achieve a percentage of the excluded market segment equal to the percentage of the market it enjoyed in the rest of the market generally).

Compared with these cases, Rossi's damage estimation is far less

67

On the subject of the Rockhill Report, we add that the defendants' criticism that the report is flawed as a matter of law because it improperly mixes data using "a variety of sources including the historic operations of Standard; ABC actual data; input from Mr. Rossi; and judgment" is unavailing. Rockhill used actual data to support his estimates, and thus they are based upon a "reasonable foundation." See Danny Kresky, 716 F.2d at 213. We do not suggest that Standard's problems with the report are baseless, only that they constitute genuine issues of material fact and should also be argued before the trier of fact.

Finally, the defendants attack the evidence supporting Rossi's assertion of damages on several other bases. Defendants submit that Rossi Florence and Rossi Roofing failed because: (1) they were start-up operations, (2) they were founded during one of the worst recessions ever to hit the New Jersey housing market, (3) Rossi, as a manager, failed to control his costs, and/or (4) Rossi worked on other ventures to the detriment and ultimate failure of both companies. One or more of these reasons, particularly the theory that it was the recession, not a conspiracy, which mortally wounded Rossi's business efforts, might explain Rossi's failure in the roofing and siding business in northern New Jersey, and could conceivably result in a verdict for the defendants at trial. They are, however, unavailing to the defendants at this stage of the case because they all involve factual disputes that need to be resolved by the trier of fact, not by this court on a motion for summary judgment.

_____

speculative. The sales revenues (at least for the first few years of the ten
year estimate) were exactly those that Rossi actually achieved while working as ABC's branch manager at the same location. Thus, the jury here need not even speculate whether the comparison market (or location) is similar enough to serve as a basis for its damage estimate, as the jury had to in Bigelow and Zenith Radio. Similarly, both the sales and expenses are based on real world numbers, not pure conjecture by an optimistic new competitor. These numbers may or may not accurately represent what Rossi Florence or Rossi Roofing would have done had it stayed in business, but they are clearly not mere speculation or wishful thinking, as was the case in Van Dyk Research and Southern Pacific.

68

Standard also argues that Rossi failed to establish causation because an essential element in causation involves proving that there are no comparable substitutes for the desired product -- here, GAF product. See Elder-Beerman Stores Corp. v. Federated Dep't Stores, Inc., 459 F.2d 138, 148 (6th Cir. 1972). This is another factual issue that Standard may argue to the jury. As we have explained above, we are satisfied that Rossi's own testimony and that of several of his witnesses are sufficient to establish that GAF product was, for practical purposes, unique and highly desired in this market. See supra S II.B.2.b(1).

In sum, Rossi has established a prima facie case of antitrust injury with respect to Standard, Arzee, and GAF. He has adduced evidence of specific lost transactions showing causation or fact of injury, which is bolstered by an expert damage report that is not overly speculative as a matter of law. The combination of this evidence, while not conclusive, provides enough of a foundation that an eventual finder of fact would be justified in making a "just and reasonable inference" of the damages Rossi may have suffered as a result of the defendants' allegedly unlawful activities.

IV. STATE LAW TORTIOUS INTERFERENCE
        WITH CONTRACTUAL AND PROSPECTIVE
        CONTRACTUAL RELATIONS

The district court dismissed Rossi's state law tortious interference claims against defendants with no discussion. It very well may be, as some of the defendants suggest, that the district court concluded when it dismissed Rossi's state law claims that Rossi had not shown any wrongful or intentional conduct designed to interfere with alleged contractual or prospective contractual relationships. If that is the case, then based upon our disposition here, the state law claims will likely have to be reinstated with respect to the Standard defendants, the Arzee defendants, and GAF since we have found that there is sufficient evidence of their participation in an unlawful conspiracy to boycott Rossi. However, the district court may have had some other reason for dismissing these claims of which neither we nor the parties before us is aware. Our jurisprudence requires

69

district courts in this circuit to accompany grants of summary judgment with an explanation sufficient to permit the parties and this court to understand the legal premise for the court's order. See Vadino v. A. Valey Eng'rs, 903 F.2d 253, 257-60 (3d Cir. 1990). We will therefore reverse the district court's order dismissing the state tortious interference claims against all defendants and remand them to the district court for further consideration and explanation consistent with this opinion.

V. CONCLUSION

For the foregoing reasons, we will affirm the district court's judgment on the federal antitrust issues with respect to Servistar and Wood Fiber, but reverse on those issues with respect to the Standard defendants, the Arzee defendants, and GAF. We will also reverse the district court's judgment dismissing the state claims with respect to all defendants. The case will be remanded for further proceedings consistent with this opinion.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

70