

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-17-2008

# Toledo Mack Sales v. Mack Trucks Inc

Precedential or Non-Precedential: Precedential

Docket No. 07-1811

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Toledo Mack Sales v. Mack Trucks Inc" (2008). *2008 Decisions.* Paper 937.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/937

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL
IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No: 07-1811
_____

TOLEDO MACK SALES & SERVICE, INC.,

Appellant,

v.

MACK TRUCKS, INC.

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 02-cv-4373)
District Judge: Honorable Ronald L. Buckwalter

_____

Argued March 5, 2008

Before:   BARRY, JORDAN, and HARDIMAN, *Circuit
Judges*.

Filed: June 17, 2008
_____

Robert L. Byer  [ARGUED]
Wayne A. Mack, Jr.
J. Manly Parks
James H. Steigerwald
David A. Degnan
Duane Morris, LLP
30 S. 17th Street
Philadelphia, PA   19103-4194
        *Counsel for Appellant*

Barbara M. Mather  [ARGUED]
Jeremy Heep
Christopher J. Huber
Barak A. Bassman
Pepper Hamilton LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA   19103-2799
        *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Toledo Mack Sales and Service, Inc. ("Toledo") appeals from an order of the United States District Court for the Eastern District of Pennsylvania granting judgment as a matter of law in favor of Mack Trucks, Inc. ("Mack") on Toledo's claim under § 1 of the Sherman Antitrust Act

2

("Sherman Act"). Toledo also appeals the District Court's grant of summary judgment for Mack on Toledo's claim under the Robinson-Patman Act ("RPA"), and its grant of judgment as a matter of law for Mack on Mack's counterclaim for misappropriation of trade secrets. Because we conclude that Toledo presented at trial enough evidence to permit the Sherman Act claim to go to the jury, we will vacate the District Court's disposition of that claim and remand for further proceedings. We will affirm the District Court in all other respects.

I.      *Jurisdiction and Standard of Review*

The District Court exercised jurisdiction over Toledo's claims pursuant to 28 U.S.C. § 1331, and over Mack's counterclaim pursuant to 28 U.S.C. §§ 1332 and 1367(a). We have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over a district court's decision to grant judgment as a matter of law. *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 88 (3d Cir. 2000). Judgment as a matter of law is appropriate "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference," a verdict in favor of the nonmovant cannot be supported by legally sufficient evidence. *Fair Hous. Council v. Main Line Times*, 141 F.3d 439, 442 (3d Cir. 1998) (citations omitted).

Our review of a district court's order granting summary judgment is also plenary. *Assaf v. Fields*, 178 F.3d 170, 171 (3d Cir. 1999). Summary judgment is appropriate if

3

"the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). As in our review of an order granting judgment as a matter of law, we must, when reviewing a summary judgment order, view all of the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992).

## II. Background

### A. Mack and Toledo

Mack manufactures a variety of heavy-duty trucks and is said to enjoy significant power within the market for such vehicles.[1] It distributes and services its products primarily through a nationwide network of authorized dealers, each of which is assigned a geographic region called an "Area of Responsibility" ("AOR"). A dealer's AOR is not exclusive, and Mack's stated policy is that dealers are free to sell anywhere in the country.

---

[1] For example, Toledo's expert economist, Frank Gollop, testified that "Mack [has] market power in both the heavy duty vocational [low cab over engine truck market,] as well as conventional straight truck markets, whether you look at the U.S. as a whole or the U.S., excluding the west." (App. at A1676; *see infra* note 16).

4

Most of Mack's trucks are made to order from various chassis, engine, and transmission options. When a potential customer contacts a Mack dealer, the dealer obtains a list of specifications from the potential customer and submits the list to Mack. Mack then informs the dealer of the price at which it is willing to sell the requested truck to the dealer. An important aspect of that price is a transaction-specific discount known as "sales assistance." The amount of sales assistance that Mack offers a dealer on a particular transaction varies according to the nature of the relationship between the dealer and the customer, the number of trucks ordered, potential competition, and other factors. Dealers' requests for sales assistance are submitted to a Mack District Manager, who has the authority to grant sales assistance up to a certain dollar amount. Requests for additional sales assistance beyond that amount typically must be submitted for approval by a Regional Vice President. Requests for sales assistance beyond the amount that a Regional Vice President may authorize must be approved by Mack's Controller. Of course, the greater the discount that Mack provides to the dealer, the lower the price that the dealer can profitably charge the customer. Once Mack tells the dealer how much the dealer will have to pay for a truck, the dealer then prepares a quote for the potential customer, using, among other things, the price it must pay Mack to fulfill the customer's order. If the customer accepts the dealer's quote, the dealer orders the truck from Mack and Mack custom-builds it according to the customer's specifications. The dealer then buys the truck from Mack and sells it to the customer. However, if the customer does not accept the dealer's quote, the dealer

usually does not buy the truck from Mack and no sale takes place.

Often, potential customers will solicit bids from multiple Mack dealers as well as from Mack's competitors. Accordingly, Mack dealers compete against both non-Mack dealers and, at least in theory, among themselves. Because the amount of sales assistance Mack offers to a dealer on a potential sale is a significant factor in determining the price at which the dealer will in turn offer to sell a truck to a potential customer, it is also a significant factor in determining whether a potential customer decides to accept a dealer's quote.

Toledo was an authorized Mack dealer located, as one might guess, in Toledo, Ohio. Dave Yeager has owned Toledo since 1982. After acquiring Toledo, Yeager implemented a business strategy that focused on offering the lowest possible price to his customers. Until Mack terminated Toledo's status as an authorized dealer, Toledo aggressively pursued its low-price sales strategy throughout the country, competing on price against other Mack dealers for sales in other dealers' AORs.

### B.     *Toledo's Sherman Act Claim*

Toledo alleges that, by competing on price against other Mack dealers, it began to undermine an unlawful conspiracy that Mack and the dealers had developed to keep

prices on Mack products artificially high.[2]   According to Toledo, this conspiracy has two parts.  First, Toledo claims that, beginning in the mid-1980s, individual Mack dealers entered into "gentlemen's agreements" not to compete with each other on price.  Second, Toledo alleges that, beginning in 1989, Mack entered into an agreement with its dealers that it would delay or deny sales assistance to any dealer who sought to make an out-of-AOR sale, thereby protecting dealers that sell within their own AORs.  Toledo argues that the combination of the horizontal collusion among dealers and the vertical collusion between Mack and the dealers violates § 1 of the Sherman Act because it prevents Mack dealers from competing with one another, thereby allowing Mack and its dealers to maintain artificially high prices on the sale of Mack trucks.  Toledo also asserts that Mack's decision to deny it sales assistance on out-of-AOR sales violates the prohibition on discriminatory pricing embodied in the RPA.

---

[2]The present case is not the first time Toledo and Mack have sparred over the antitrust implications of Mack's approach to providing sales assistance.  Between March 1988 and October 1990, Toledo's attorney sent several letters to Mack claiming that Mack's conduct violated § 1 of the Sherman Act.  In 1991, Toledo and Mack signed a release which read: "Each of Mack and Toledo hereby fully releases ... the other ... from any and all claims, demands, losses, expenses, action, cause of action, or liabilities whatsoever arising out of or in connection with sales assistance ... claimed, requested, approved, paid, credited, or rescinded as of the date of this release ... ."   (App. at A4460-61.)

7

At trial, Toledo presented evidence to show the existence of the alleged horizontal and vertical agreements.

### 1. *Toledo's Evidence of Agreements Among Mack Dealers*

Toledo offered testimony that Mack dealers agreed not to compete with one another. Yeager, Toledo's owner, testified that, while he was attending a dealer meeting in the late 1980s, two Mack dealers from New Jersey approached him and told him that "the way it works" in New Jersey is that "dealers don't compete on price." (App. at A513.) Toledo also introduced deposition testimony by Jack Lusty, a former District Manager for Mack who had been responsible for supervising Toledo from 1998 to 2002. Lusty said that, despite Mack's official policy of allowing dealers to sell anywhere, Mack dealers had unwritten agreements not to compete with each other. Finally, Toledo introduced copies of handwritten notes taken at a Mack sales meeting in 1999 by a consultant named Hallie Giuliano. At that time, Giuliano was working on a project for Mack and, according to her notes and an affidavit she signed later, she heard Ron Gerhard, a Mack employee, say at the sales meeting that "there was a 'gentlemen's agreement' among Mack truck dealers that they would sell only in their own areas of responsibility. [Gerhard] also stated that some Mack truck dealers did not honor the 'gentlemen's agreements' and engaged in sales efforts in other Mack dealers' territories." (App. at A3537.)

Toledo also presented three categories of evidence to show that Mack agreed with its dealers that it would deny sales assistance on sales a dealer tried to make outside of that dealer's AOR. First, Toledo introduced recordings and notes of conversations between Yeager and various Mack executives referring to an informal policy against out-of-AOR sales. Second, Toledo introduced evidence that, in 1989, Mack adopted an official policy of denying sales assistance on out-of-AOR sales. Toledo also presented evidence that this policy was the result of a meeting between Mack executives and dealer representatives. Finally, Toledo presented evidence that, despite Mack's claims to have abandoned its prior policy, Mack in fact continued to enforce that policy until at least the time Toledo filed suit in 2002.

With respect to evidence of an informal policy, Toledo introduced at trial notes taken in July 1988 by Richard Tracht, the Mack District Manager responsible for overseeing Toledo at that time. According to Tracht's notes, Yeager asked him whether Mack approved of Toledo's practice of selling trucks outside its AOR. Tracht recorded that he told Yeager that "Mack did not like [Yeager's] policy as he was selling the majority of his trucks to already established Mack customers and in doing so was breaking established profit structures ... [making] the Mack dealers look bad in customers [sic] eyes causing a lot of concern between customers and dealers." (App. at A3963.)

Toledo also introduced a cartoon Tracht sent to Yeager featuring two shabbily dressed men sitting in front of a "poor house," with one man saying to the other,"[m]y Mack Distributorship did more business than any others in the state. The trick was to undercut my competitor's rates." (App. at A3286.) At the top of the cartoon, Tracht had typed: "This could be what we are headed for if we do not stop selling against other Mack dealers and concentrate on the real competition. Think about it!!" *Id.*

In addition, Toledo introduced a recording of a December 1988 telephone conversation[3] between Yeager and Dennis Wurzelbacher, Mack's then-Parts Promotion Manager. During that conversation, Yeager and Wurzelbacher discussed the sales of Mack parts called "glider kits," which are bare truck bodies without engines or transmissions. Wurzelbacher told Yeager that "[t]he ... problem we have is there are certain dealers that are sending [sic] glider kits in other people's backyards and we are getting calls on it." (App. at A3994.3) Yeager then asked Wurzelbacher what Mack's written policy was on dealers competing with one another. Wurzelbacher responded that he was not aware of an official company policy but that it was his opinion that "there was a policy that would say, hey,

---

[3]Over the course of several years, Yeager had secretly recorded a number of telephone conversations between himself and various Mack executives, and those recordings featured prominently in Toledo's evidence at trial.

10

you're only supposed to sell in your territory, okay?" (App. at A3994.4.)

Toledo also introduced evidence that Mack adopted an official policy of denying sales assistance on out-of-AOR sales. In 1989, Mack issued Marketing Distribution Bulletin 38-89 ("Bulletin 38-89"). Under this "major ... change in official truck pricing policy" (App. at A3147), Mack sought to "enhance the competitive strength of Mack distributors within their respective geographic areas of sales and service responsibility." *Id.* To that end, Mack eliminated sales assistance on sales by a dealer outside the dealer's AOR. The express purpose of the policy was to create "increased profit margins for Mack distributors as well as the Company." (App. at A3147.)

Toledo introduced evidence at trial to show that Bulletin 38-89 was the result of an agreement between Mack and its National Distributor Advisory Council ("NDAC") to prevent dealers from engaging in sales outside their AORs.[4] Specifically, Toledo introduced a recording of a July 1989 phone call between Yeager and Dick Murphy, a Mack Vice President, during which Yeager asked Murphy whether the

---

[4]The NDAC consists of two Mack executives and seven dealers. The NDAC's dealer members are elected by their peers at an annual dealers meeting. Two of the seven dealer representatives serve as NDAC's Chairman and Vice Chairman, and the remaining five serve as representatives for five geographic regions.

NDAC had unanimously recommended Bulletin 38-89. Murphy responded, "Oh yes. Oh very much so. Very much so. I mean, something as significant as this, it had to come from all walks." (App. at A4025.) Murphy indicated that some dealers had complained about the new policy. He then said "if there's something that would justify [changing the policy] we'll get the [NDAC] together and perhaps we'll consider it." (App. at A4024.)

Toledo also introduced a recording of another July 1989 conversation between Yeager and Gary Johnson, Mack's Vice President of Distributor Sales. During that exchange, Johnson explained that he was "kind of new on the job" and then went on to say that

> the one thing I can tell you that would be fair and legitimate advice is that I think this policy [i.e., Bulletin 38-89] came about to a large extent because of the voice of the distributor organization. ... And if it's probably ever gonna be changed or modified, it will come about as a result of the voice of the dealer organization.

(App. at A4058.)

Johnson then stated, "I can tell you, and this probably is not a surprise, that when we talked about some of the problems that come from selling outside of the territory, I guess Toledo goes pretty close to the top of the list." (App. at A4059.) After some additional discussion, Yeager stated that, "[a]s I understand what [the dealer network did,] they

12

did not recommend [a] restrictional territorial system. ...
[A]nd if they did, it's strictly a self-serving type of thing for
the dealers that have a lot of geographical area." (App. at
A4062-63.) Johnson responded by simply saying "Um-
hmm."[5] (App. at A4063.)

---

[5]Of course, on this and other points, Mack introduced
evidence to contradict Toledo's evidence. For example, Mack
provided evidence to support its argument that Bulletin 38-89
was solely the product of Mack management's decision-
making, not the NDAC's. Bob Nuss, who was the NDAC
Chairman during 1989, testified that, on May 8, 1989, Mack
presented a draft of Bulletin 38-89 to the dealers at an NDAC
meeting. According to Nuss, the draft included provisions
eliminating sales assistance for out-of-AOR sales and
provisions providing that Mack would give dealers sales
assistance on one- and two- truck deals. Nuss also testified
that "[t]he new truck retail pricing policy was discussed
thoroughly"(App. at A2197), and that while the dealers had
insisted that Bulletin 38-89 include sales assistance on one-
and two-truck deals, the decision to eliminate sales assistance
on out-of-AOR sales was made by Mack alone. Finally, Nuss
testified that, although Mack solicited comments on Bulletin
38-89 from NDAC members, the final language in Bulletin
38-89 which eliminated sales assistance on out-of-AOR sales
was identical to the language in the draft proposal circulated
at the May 8, 1989 meeting. Mack's evidence, however, does
not override our obligation to view the evidence in the light
most favorable to Toledo. *See Northview Motors*, 227 F.3d
at 88 (explaining that judgment as a matter of law is

13

In October 1989, shortly after it had adopted Bulletin 38-89, Mack issued a revised policy, Marketing Distribution Bulletin Addendum 38-89A ("Bulletin 38-89A"). Bulletin 38-89A provided that "[s]ales [a]ssistance shall be uniformly made available to ALL Mack distributors on an equal basis, actively and directly involved in prior negotiations with the retail customer for the purchase of new Mack vehicles." (App. at A3982 original emphasis). Toledo presented evidence at trial, however, indicating that, despite the new policy, Mack and some of its dealers continued to work in concert to prevent other Mack dealers from selling outside their individually assigned AORs.

Regarding the period from 1989 to 1998, Toledo introduced a recording of a January 1991 telephone conversation between Yeager and Kevin Flaherty, Mack's Vice-President for Sales. During the conversation, Yeager and Flaherty discussed some difficulties Yeager was having selling three trucks Toledo had bought from Mack.[6] Yeager

---

appropriate "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability") (citations and internal quotation marks omitted).

[6]A Mack dealer would ordinarily have little difficulty selling a truck it had bought from Mack because, as we have explained, Mack trucks are specialized, custom-made goods and a dealer ordinarily does not purchase a truck from Mack

requested sales assistance to sell those trucks outside of his AOR. Flaherty told him, however, that "our policy has not changed" and that Mack would provide sales assistance if Yeager sold the trucks inside his AOR but would not "give a whole lot of hope" if the sales were outside of it. (App. at 4085-86.) Flaherty emphasized, "[O]bviously, we're looking to protect our distributors. That's always been the backbone of Mack is to protect our distributors." (App. at 4086.) During a second conversation between Yeager and Flaherty in June 1991, Flaherty stated that "[if] there's ever a manufacturer that protected their distributor organization ... It's the Mack truck company, to a fault." (App. at 4128.)

Toledo also introduced a recording of a conversation that took place in 1996 between Yeager and Bob Grussing, Mack's Parts Manager. Grussing told Yeager that dealers "constantly want Mack to get involved in these territorial disputes ... and to protect them from one another. And right or wrong, we do that, you know." (App. at A4147.)

---

until a customer actually places an order with the dealer. However, Yeager explained to Flaherty during their conversation that Toledo had ordered the three trucks discussed above because Mack "was in bad need of orders at that time" and had "encouraged [Toledo] to place an order." (App. at A4087.)

15

Grussing also stated that such protection was a "long standing tradition" and that "I don't know if I can break that." *Id.*

To establish that Mack continued to participate in an illegal conspiracy with its dealers from 1998 to 2002, Toledo points to various conversations between Jack Lusty, the Mack District Manager responsible for supervising Toledo during that time period, and Jeff Yelles, a Mack Regional Vice President who was Lusty's immediate superior. Lusty testified that Yelles told him in 2002 that he "kn[ew] what [Toledo] [was] trying to do. [Toledo] wants to establish discounts and sell trucks all over the place. We are not going to let this happen." (App. at A2824.) Lusty also testified that Yelles told him that Yeager was "just soliciting customers on price; ... we have to beat the living shit out of him. ... [H]e is a son of a bitch." (App. at A2818.) Yelles also allegedly told Lusty, in a profanity-laced burst of anger, that Toledo was not "play[ing] by the rules" and that someone "should take [Yeager] out." (App. at A2825.)

Toledo presented evidence that Yelles took affirmative steps to prevent Toledo from selling outside its AOR. Lusty testified that, in 2000, Yelles instructed him to tell Toledo to stop competing against another Mack dealer for a particular sale to a customer located outside Toledo's AOR. Yelles told Lusty to tell Toledo that Mack would not release sales assistance on any sale by Toledo to that customer. Accordingly, Lusty sent Yeager a fax instructing him to "cease his predatory approach to customer prospecting." (App. at 2812.) Yelles himself admitted at trial that, on at least one occasion in 2003, he asked Mack's Controller, Steve

16

Polzer, to delay approving Toledo's request for sales assistance so that another Mack dealer could get the customer's business instead.

Finally, Lusty testified that, after 1998, Mack used the sales assistance process to "control dealers." After rescinding the 1989 policy, Mack implemented a system of "cross-checks" which were ostensibly designed to ensure that, in a situation where an out-of-AOR dealer competed with an in-AOR dealer, both dealers received the same amount of sales assistance from Mack. The system was presented by Mack as requiring equal treatment. Supposedly, a dealer who wished to make an out-of-AOR sale had to indicate to its District Manager the area into which the dealer wished to make the sale before it could receive sales assistance. The dealer's District Manager would then conduct a cross-check by contacting the District Manager responsible for that AOR and informing him or her of the potential sale. If it turned out that the dealer into whose AOR the sale would be made was competing for the same deal, then the in-AOR District Manager and the out-of-AOR District Manager were to ensure that both dealers received equal amounts of sales assistance.

Despite the stated purpose of the cross-checks, however, Lusty testified that from 1999 to 2003, the cross-checks were often used as an "early warning system" to let an in-AOR dealer know when an out-of-AOR dealer was attempting to make a sale inside the in-AOR dealer's territory. (App. at A2877.) Lusty explained that District Managers would often grant requests for sales assistance verbally rather

17

than using Mack's computer system, so that in-AOR dealers could give a potential customer a quote before an out-of-AOR dealer could obtain a quote on the same deal. Lusty also said that, because there was no record of verbal grants of sales assistance, District Managers would sometimes use this tactic to extend a discount to a dealer without conducting a cross-check.

### C.     *Toledo's RPA Claim*

Toledo also introduced expert testimony at trial to support its contention that Mack had offered it less favorable sales assistance than it provided to other dealers. That testimony was based on a comparison of the average amount of sales assistance Mack offered to Toledo as compared with the average amount of sales assistance Mack had offered to other dealers located in the same general geographic area. Toledo's expert testified that this comparison demonstrated that Toledo received far less sales assistance than other similarly situated Mack dealers. However, the expert did not compare the amount of sales assistance Mack offered to Toledo and to other dealers when Toledo and another dealer competed directly against one another for a sale to the same customer. Therefore, the expert was unable to offer an opinion about whether Mack had discriminated against Toledo in sales involving head-to-head competition with another Mack dealer.

> D. *Mack's Counterclaim for Misappropriation of Trade Secrets*

Once sued, Mack fired back with a counterclaim alleging that Toledo had misappropriated a proprietary software program called MACSPEC 2001, which contained detailed parts specifications for every truck part that Mack manufactures. Mack had provided a copy of that program to Toledo so that it could adequately assist customers who needed replacement parts or repair work. However, according to Mack, Toledo gave a copy of MACSPEC 2001 to PAI Industries, Inc., one of Mack's competitors. Contending that Toledo had violated both its obligation not to misappropriate trade secrets and the terms of the MACSPEC 2001 license agreement, Mack terminated Toledo's distributorship agreement. Toledo responded with a protest to the Ohio Vehicle Dealer's Board, which ruled in favor of Toledo. Mack unsuccessfully appealed to the Franklin County Court of Common Pleas. Mack then further appealed to the Tenth Appellate District of the Ohio Court of Appeals. That court reversed and held that Mack was justified in terminating Toledo's distributorship agreement because the MACSPEC 2001 software was a proprietary trade secret which Toledo had misappropriated by transferring it to a Mack competitor without Mack's permission. *Mack Trucks, Inc. v. Motor Vehicle Dealers Bd.*, No. 05AP-768, 2006 WL 1495122, at *6-10 (Ohio Ct. App. June 1, 2006).

19

## E.     *Procedural History*

Toledo filed this case against Mack on July 7, 2002.[7] As already noted, Toledo's complaint alleged that Mack and its distributors had entered into an illegal conspiracy in restraint of trade in violation of § 1 of the Sherman Act, and that Mack had violated the RPA by engaging in discriminatory pricing.  Again, as noted, Mack counterclaimed for misappropriation of trade secrets.

Prior to the trial, the District Court granted summary judgment in favor of Mack on Toledo's RPA claim, concluding that it was barred as a matter of law under *Volvo Trucks North America, Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164 (2006).  At the close of evidence at trial, the District Court granted Mack's motion for judgment as a matter of law on Toledo's Sherman Act claim.  The Court also granted Mack's motion for judgment as a matter of law on the misappropriation of trade secrets counterclaim.  As to the latter ruling, the Court concluded that the favorable judgment for Mack in the Ohio Court of Appeals was preclusive as to the issue of Toledo's liability because the Ohio judgment encompassed every element necessary to show a misappropriation of trade secrets.  The District Court then submitted Mack's misappropriation counterclaim to the jury

---

[7]Because of the 1991 release between it and Mack, (*see supra* note 2) Toledo limited its 2002 claims to "conduct by Mack *subsequent to the date of the release*."  (Appellant Br. at 16-17) (emphasis added).

on the issue of damages. The jury returned a verdict of $11.34 million.

In an opinion and order denying Toledo's post-trial motion for reconsideration, the District Court explained that Toledo's § 1 claim was barred by the applicable four-year statute of limitations because "Yeager knew or had reason to know of the alleged conspiracy as early as 1989." (App. at A5.) The District Court then presented a summary of Toledo's evidence within the limitations period and, relying on Supreme Court cases discussing the special restrictions on the inferences that may permissibly be drawn from the evidence in antitrust cases, concluded that none of that evidence showed that an illegal conspiracy existed because "[t]he inferences [Toledo] wants to draw fall short of reasonable ones in the antitrust context." (App. at A8.) Finally, the District Court reduced the jury's damages award to $1.6 million, which Mack accepted. Toledo then filed this timely appeal.

III.    *Discussion*

Toledo raises three issues on appeal. First, it contends that it adduced sufficient evidence for its § 1 claim to go the jury and that, therefore, the District Court erred by granting judgment as a matter of law on that claim. Second, Toledo argues that the District Court erred in granting summary judgment in favor of Mack on its RPA claim because the database discussed at trial showed that Mack sold trucks to other dealers at favorable prices that it refused to extend to Toledo. Finally, Toledo contends that Mack's counterclaim

21

for misappropriation of trade secrets is barred by Pennsylvania's "gist of the action" doctrine. We discuss each of these arguments in turn.

### A. Toledo's Sherman Act § 1 Claim

Section 1 of the Sherman Act prohibits "a conspiracy ... in restraint of trade or commerce among the several States ... ." 15 U.S.C. § 1. On appeal, the parties' primary contentions concern whether Toledo's evidence was sufficient to allow a jury to consider whether illegal agreements existed among Mack dealers and between Mack dealers and Mack itself.[8] Before turning to the parties' arguments on this point,

---

[8]Collusion between a manufacturer and its dealers to keep a product's price artificially high is likely to be an unusual phenomenon because other manufacturers and dealers of the same or substitute products can, simply by selling at a lower price, render the colluding parties' agreement economically unwise. *See* Phillip E. Areeda, Herbert Hovenkamp, Fundamentals of Antitrust Law § 1603f (3d ed. 2007) (explaining that "[d]ealers cannot win excess profit through a distribution restraint unless a manufacturer who [agrees to assist] them has sufficient market power to make a restriction on output feasible and profitable."). However, collusion between manufacturers and dealers is feasible when one manufacturer dominates the market, or when all manufacturers in the market enter into agreements with their dealers to keep prices artificially high. *Id.* §§ 16.03f3, 16.03f4. As discussed more fully herein, *infra* at 37-41, such

22

however, we address the District Court's conclusion that Toledo's suit was barred by the statute of limitations.

*1.      The Statute of Limitations*

Section 1 claims are subject to a four-year statute of limitations.  15 U.S.C. § 15b.  In granting Mack's motion for judgment as a matter of law on Toledo's § 1 claim, the District Court declined to consider pre-1998 evidence of the existence of a conspiracy because it concluded that "Yeager knew or had reason to know of the alleged conspiracy as early as 1989 and thus the suit filed 13 years later [in 2002] was barred by the four-year statute of limitations."  (App. at A5.) The District Court then went on to examine whether evidence of events within the limitations period from 1998 to 2002 was sufficient to allow the jury to conclude that a conspiracy existed.  The District Court concluded that the 1998 to 2002 evidence was not sufficient because "the inferences [Toledo] wants to draw fall short of reasonable ones in an antitrust context."  (App. at A7 (citing *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 124 (3d Cir. 1999)).)

---

collusive agreements may be unlawful under the rule of reason analysis applied to vertical price restraints under § 1. *See, e.g., Leegin Creative Leather Prods., Inc., v. PSKS, Inc.*, 127 S. Ct. 2705, 2717 (2007) (explaining that "[t]o the extent a vertical agreement setting minimum resale prices is entered upon to facilitate [a dealer] cartel, it ... would need to be held unlawful under the rule of reason").

Toledo argues that the District Court erred by requiring it to show exclusively with post-1998 evidence that a conspiracy existed. Instead, Toledo contends that the District Court should have considered whether all of the evidence it presented, including evidence of events prior to 1998, was sufficient to allow a jury to conclude that, from 1998 until at least 2002, Mack and its dealers engaged in overt acts in furtherance of a continuing conspiracy that began before 1998. We agree. Although Toledo claims that the conspiracy began in 1989, long before the limitations period, it presented evidence from which a rational jury could conclude that the unlawful agreements continued in effect through the time of trial in 2002. Toledo seeks damages only for acts committed in furtherance of the conspiracy from 1998 to 2002, within the limitations period, but it is entitled to present evidence from outside that period to sustain its burden of proof.

The Supreme Court has held that "[g]enerally, a cause of action under § 1 accrues and the statute of limitations begins to run when a defendant commits an act that injures the plaintiff's business." *Zenith Radio Co. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) (citation omitted). However, "[i]n the context of a continuing conspiracy to violate the antitrust laws, ... each time a plaintiff is injured by an act of the defendant[] a cause of action accrues to [it] to recover the damages caused by that act ... and ... as to those damages, the statute of limitations runs from the commission of the act." *Id.* (citations omitted); *see also Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968) (concluding that the plaintiff could bring a § 1 claim in 1955 for conduct which first began in 1912 because the

24

defendant's actions were "conduct which constituted a continuing violation of the Sherman Act, and which inflicted continuing and accumulating harm on [the plaintiff]").

Consistent with that precedent, we have stated that "a conspiracy's refusal to deal, which began outside the limitations period, may be viewed as a continuing series of acts upon which successive causes of action may accrue." *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1173 (3d Cir. 1993) (citation and internal quotation marks omitted). Therefore, we hold that Toledo was not required to prove an illegal conspiracy with evidence restricted to the limitations period. Its burden was, rather, to present evidence sufficient to allow a rational jury to conclude that Mack and its dealers committed during the limitations period overt acts in furtherance of an illegal conspiracy or conspiracies, even if the conspiracies began before the limitations period.[9] We turn

---

[9]Both in its brief and at oral argument, Mack argued that the District Court's decision was correct because Toledo's evidence and the inferences that could be drawn from that evidence would not allow a jury to conclude that any illegal conspiracy ever existed or, alternatively, that any conspiracy continued in effect during the limitations period. By its own terms, however, that argument is about the sufficiency of Toledo's evidence, not about the legal rules governing continuing conspiracy cases under § 1. In a related argument, Mack contends that the 1991 release between it and Toledo, *see supra* note 2, bars Toledo's § 1 claim. We disagree. The release does not apply to claims for antitrust damages based

now to whether the evidence that Toledo presented at trial meets that standard.

### 2.    The Sufficiency of Toledo's Evidence

At the outset, we are mindful that, under our standard of review, we must "expose the evidence to the strongest light favorable to the party against whom the motion [for judgment as a matter of law] is made and give [that party] the advantage of every fair and reasonable inference." *Raiczyk v. Ocean County Veterinary Hosp.*, 377 F.3d 266, 269 (3d Cir. 2004) (citation omitted).  In addition, we must not "tightly compartmentalize the evidence," but review it "as a whole to see if it together supports an inference of concerted action." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware, Co., Inc.*, 998 F.2d 1224, 1230 (3d Cir. 1993).

Of course, we must comply with those standards in the context of the precise language of § 1 and the cases

---

on events which occur after the execution of the release.  *Cf. Three Rivers Motor Co. v. Ford Motor Co.*, 522 F.2d 885, 896 n.27 (3d Cir. 1975) (holding that parties may not waive liability for future antitrust violations).  Although the release prevents Toledo from seeking damages for events that occurred before 1991, Mack cites no authority, nor have we found any, for the proposition that a release prevents a party from relying on events that occurred prior to the signing of the release to establish facts necessary to show a continuing conspiracy.

interpreting it. As noted, § 1 prohibits "[e]very contract, combination ... or conspiracy, in restraint of trade." We have explained that "[d]espite its broad language, Section 1 only prohibits contracts, combinations, or conspiracies that *unreasonably* restrain trade." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 356 (3d Cir. 2004) (original emphasis). Thus, to succeed on a § 1 claim, a plaintiff must meet two requirements. First, the plaintiff must show that the defendant was a party to a "contract, combination ... or conspiracy." Second, the plaintiff must show that the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade.

In the present case, Toledo alleges that Mack dealers entered into an unlawful conspiracy among themselves to fix prices, and Toledo further alleges that Mack agreed to support that conspiracy by, among other things, denying sales assistance to a dealer that, like Toledo, attempted to compete against other Mack dealers on price. In what follows, we analyze both of those purported agreements – the horizontal agreement among the dealers, and the vertical agreement between Mack and the dealers – to determine whether Toledo presented sufficient evidence for a jury to decide that each agreement existed and that each agreement was a conspiracy that unreasonably restrained trade in violation of § 1. As explained more fully below, special rules govern our analysis of Toledo's evidence for the existence of the agreements and their legality.

27

Because § 1 of the Sherman Act by its terms requires concerted action, "unilateral activity, no matter what its motivation, cannot give rise to a § 1 violation." *Rossi v. Standard Roofing, Inc.*, 156 F.3d 456, 465 (3d Cir. 1998). To show concerted action, a plaintiff must produce evidence that would allow a jury to infer that "the alleged conspirators had a unity of purpose or a common design and understanding, or a meeting of the minds." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). Regarding the types of evidence which may be used to show that the concerted action requirement is met, we have said that,

> [w]hile direct evidence, the proverbial 'smoking-gun,' is generally the most compelling means by which a plaintiff can make out his or her claim, it is also frequently difficult for antitrust plaintiffs to come by. Thus, plaintiffs have been permitted to rely solely on circumstantial evidence (and the reasonable inferences that may be drawn therefrom) to prove a conspiracy.

*Rossi*, 156 F.3d at 465.

Further, to avoid punishing lawful conduct, the Supreme Court has placed certain limits on the inferences that may be drawn from the evidence in antitrust cases. The Court has explained that certain evidentiary restrictions are

necessary in antitrust cases since "mistaken inferences ... are especially costly because they chill the very conduct the antitrust laws are designed to protect." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 594 (1986). Therefore, "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case. ... [C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* at 588 (citations omitted). In addition, "if the factual context renders the plaintiff's claim implausible – if the claim is one that simply makes no economic sense – a plaintiff must come forward with more persuasive evidence to support its claim than would otherwise be necessary." *Rossi*, 156 F.3d at 466 (quoting *Monsanto*, 475 U.S. at 587) (punctuation omitted). Finally, "in evaluating whether a genuine issue for trial exists, the antitrust defendants' economic motive is highly relevant. If the defendants had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." *Id.* (quoting *Monsanto*, 475 U.S. at 596) (punctuation omitted). Nevertheless, we have held that those limits on inferences do not apply to a plaintiff's direct evidence of an unlawful agreement under § 1.[10] *Id.*

---

[10]We have held that the strictures on circumstantial evidence in antitrust cases

> only appl[y] when the plaintiff has failed to put forth direct evidence of conspiracy. Thus, in

29

In the present case, Toledo presented several pieces of direct evidence for the existence of one or more agreements among Mack dealers not to compete with each other. Because we conclude that Toledo's direct evidence is sufficient to allow a jury to conclude that a conspiracy not to compete existed among Mack dealers, we need not apply the rules restricting inferences drawn from circumstantial evidence.

Toledo's first piece of evidence of an agreement not to compete was Yeager's testimony that, in the early 1980s, other Mack dealers told him bluntly that dealers "did not compete on price." (App. at A513.) Second, Mack consultant Hallie Giuliano testified that in 1999, Ron Gerhard, a Mack

---

> direct evidence cases, the plaintiff need not adduce circumstantial evidence that tends to exclude the possibility that the alleged conspirators acted independently, and there need not be an inquiry into the plausibility of the defendants' claim or the rationality of defendants' economic motives. This is because when the plaintiff has put forth direct evidence of conspiracy, the fact finder is not required to make inferences to establish facts, and therefore the Supreme Court's concerns over the reasonableness of inferences in antitrust cases evaporate.

*Rossi*, 156 F.3d at 466.

employee, told her that "there was a 'gentlemen's agreement' among Mack truck dealers that they would sell only in their own AORs ... [but] that some Mack truck dealers did not honor the 'gentlemen's agreements' and engaged in efforts in other Mack dealers' territories." (App. at A3537.) Finally, when Jack Lusty, Yeager's district manager from 1998 to 2002, was asked whether "some Mack dealers [had] unwritten understandings with other Mack dealers that they wouldn't compete in each other's AOR's," he responded that "[t]here were – there were some Mack dealers that – and I've heard them called gentlemen's agreements, where they wouldn't compete in other dealers' areas ... ." (App. at A2877.)

While admitting that the record before us contains statements about agreements between dealers, Mack argues that Toledo's evidence is insufficient to give to a jury because the record does not reveal the exact extent of any such agreements. Viewing the evidence in the light most favorable to Toledo, Mack's argument is unpersuasive. It may well be that Toledo's inability to present the details of any agreement among dealers would leave a jury unpersuaded that such agreements did in fact exist. That, however, is not our inquiry. Instead, we must consider whether the evidence entitles Toledo to place that question before the jury at all. We believe it does. Simply put, Toledo's evidence was sufficient because a jury considering it could believe it and reasonably conclude that agreements not to compete did exist

31

among Mack dealers.[11]  The possibility that a jury might not believe the direct evidence does not, in itself, mean that the jury should not consider it.

Having concluded that Toledo's evidence was sufficient to show the existence of a non-competition agreement among Mack dealers, we turn to whether the jury could conclude that the agreement was an unreasonable restraint of trade in violation of § 1.  When considering the legality of an agreement under § 1, two different methods of analysis may be used, depending upon the nature of the agreement at issue.  "Certain restraints of trade are *per se* unreasonable, while others require more searching analysis under the 'rule of reason.'"  *Flat Glass*, 385 F.3d at 356.  *Per se* restraints are "conclusively presumed to unreasonably restrain competition 'without elaborate inquiry as to the precise harm [they have] caused or the business excuse for [their] use.'"  *Id.*  (quoting *Rossi*, 156 F.3d at 461).  The limited categories of agreements subject to *per se* treatment include "horizontal price-fixing - i.e., where competitors at the same market level agree to fix or control the prices they will charge for their respective goods or services ... ."  *Id.* (citations and internal punctuation and quotation marks

---

[11]Consistent with our earlier discussion of the principles governing continuing conspiracy cases, we note that Toledo's evidence of agreements between dealers includes statements about events that took place in the 1980s, outside the limitations period, as well as later statements and evidence about the existence of horizontal agreements.

omitted); *see also Leegin*, 127 S. Ct. at 2717 ("A horizontal cartel among ... competing retailers that ... reduces competition in order to increase price is, and ought to be, *per se* unlawful."). It is readily apparent that, if there were an agreement among Mack dealers as alleged, it involved horizontal competitors colluding to control prices and, therefore, would be *per se* unlawful. Thus, viewed in the light most favorable to Toledo, the evidence shows a horizontal agreement that violates § 1.

> b.    *Toledo's Evidence of an Unlawful Agreement Between the Dealers and Mack*

Obviously, evidence sufficient to allow a jury to conclude that illegal agreements existed among Mack dealers does not establish that Mack itself was a party to an agreement that violated § 1 of the Sherman Act. Toledo contends, however, that it presented sufficient evidence to allow a jury to conclude that Mack did enter into an illegal vertical agreement with its dealers. According to Toledo, it showed an agreement between the dealers and Mack that Mack would support the dealers' illegal conspiracy to control prices, and that one tool Mack employed to that end was a *de facto* ban on out-of-AOR sales by dealers like Toledo that sought to compete with other dealers on price.

Our analysis of the alleged vertical agreement between Mack and its dealers follows the same pattern we used when considering the alleged horizontal agreement among the

dealers.  First, we consider Toledo's evidence of the agreement, and second, we consider the agreement's legality.

Toledo presented direct evidence that Mack agreed with its dealers to support their anti-competitive agreements and that it did so by, among other things, refusing to offer sales assistance to dealers who sought to sell outside their AORs.[12]  Jack Lusty testified that Jeff Yelles told him in 2002, during the time when Mack ostensibly permitted its dealers to sell everywhere, that he "kn[ew] what [Toledo] [was] trying to do. [Toledo] wants to establish discounts and sell trucks all over the place.  We are not going to let this happen." (App. at A2824.)  Lusty also testified that Mack executives used sales assistance to "control dealers and that the real purpose of Mack's system of cross-checks was to give an in-AOR dealer the advantage over an out-of-AOR dealer."

---

[12]We reiterate that, under *Rossi*, we need not apply the strictures on inferences drawn from ambiguous circumstantial evidence that would apply in the absence of direct evidence of a conspiracy.  Nevertheless, in addition to Toledo's direct evidence of an agreement between the dealers and Mack, Toledo had indirect evidence of that conspiracy, including its evidence that Mack acted contrary to its own stated policy of allowing out-of-AOR sales.  Even under *Monsanto*'s limitations on inferences from circumstantial evidence, that evidence appears to have been sufficient to create a jury question as to whether there was an agreement between Mack and its dealers.

34

Moreover, Mack does not contest that, in 1989, it issued Bulletin 38-89, which eliminated sales assistance to dealers on sales outside their AORs.  Importantly for purposes of showing a conspiracy under § 1, Toledo presented evidence that Bulletin 38-89 was the result of a collaboration between Mack and its dealers.  According to that evidence, Mack's NDAC, a group consisting of both Mack executives and dealer representatives, worked on a draft of Bulletin 38-89.  In addition, when Yeager asked Dick Murphy whether NDAC's approval of the new policy was a "unanimous kind of thing," Murphy responded,  "Oh yes.  Oh very much so.  Very much so.  I mean, something as significant as this, it had to come from all walks."  (App. at A4025.)  Mack's Vice President of Distributor Sales, Gary Johnson, told Yeager that

> the one thing I can tell you that would be fair and legitimate advice is that I think this policy came about to a large extent because of the voice of the distributor organization ... .  If it's probably ever gonna be changed or modified, it will come about as a result of the voice of dealer organizations.

(App. at A4058.)

Mack's attempts to discredit Johnson's statement about the dealers' role in creating Bulletin 38-89 only demonstrates why the jury should have been given a chance to consider Toledo's § 1 claim.  First, Mack argues that Johnson was mistaken because, immediately before explaining the origins of the policy, he stated that he was "new on the job."  While a

35

jury presented with that argument might conclude that Johnson's statements are insufficient to establish that Mack and its dealers conspired, that does not mean that a jury could not believe Johnson and reach the opposite conclusion. Johnson stated unequivocally that Bulletin 38-89 "came about to a large extent because of the voice of the distributor organization." (App. at A4058.) Because Bulletin 38-89 was issued as official Mack policy, a jury presented with Johnson's statement, along with Murphy's statement, could rationally conclude that Bulletin 38-89 was the result of an agreement between Mack and its dealers.

Mack also attacks Johnson's statement by citing our decision in *Edward J. Sweeney & Sons, Inc. v. Texaco Inc.,* 637 F.2d 105 (3d Cir. 1980). In *Sweeney*, we held that testimony would not support an inference of conspiracy when a witness stated that he "believed [the defendant] changed [the plaintiff's] hauling allowance because of ... retailer complaints," but then admitted that his opinion "was just an unsupported surmise." 637 F.2d at 112. Seizing on the witness's statement in *Sweeney* that his belief was an "unsupported surmise," Mack argues that, because Johnson only told Yeager "what [he] th[ought] occurred," his statement is insufficient to support an inference of conspiracy. We disagree. In the first place, *Sweeney* is inapposite because Johnson's statement is direct evidence of collusion, which, if believed, requires no further inference. Second, unlike the witness in *Sweeney*, Johnson never stated that his belief about the origins of Bulletin 38-89 lacked support, and his position as Vice President of Distributor Sales buttresses the

36

conclusion that his statement was based on first-hand knowledge, not mere surmise.

Mack's argument that Murphy's statements cannot be taken as showing a conspiracy is equally unpersuasive. Relying on *Monsanto*, Mack argues that the tape recording of Yeager's conversation with Murphy shows, at most, that Mack responded to dealer complaints about Toledo. In *Monsanto*, the Supreme Court held that, to establish concerted action under § 1 using direct evidence, a plaintiff cannot simply show that the defendant received complaints about the plaintiff's price cutting from other dealers, nor is it enough to show that the defendant received complaints and acted in response. 465 U.S. at 764 (citing *Sweeney*, 637 F.2d at 111-12). Instead, a plaintiff must produce evidence that would allow a jury to conclude that "the alleged conspirators had a unity of purpose or a common design and understanding, or a meeting of the minds." *Id.* The necessary "meeting of the minds" requires "more than a showing that the distributor conformed to the suggested price. It means as well that evidence must be presented both that the distributor communicated its acquiescence or agreement, and that this was sought by the manufacturer." *Id.* at 764 n.9.

Mack argues that Yeager's conversation with Murphy does not meet *Monsanto*'s requirements because, even if believed, it shows only that Mack adopted Bulletin 38-89 in response to dealer complaints. However, in *Monsanto* itself, the Court held that a jury should be permitted to consider whether a conspiracy existed based on evidence of a meeting

37

between Monsanto and its distributors. During the meeting at issue in that case, the parties discussed "Monsanto's efforts to get the market place in order," *id.* at 765 (internal punctuation omitted), and also discussed how to ensure a "level playground" in which the decision of the "umpire" in enforcing the "rules of the game" would be final, *id.* at 766. The Supreme Court agreed that the report of the meeting could be describing "the likely reaction to unilateral Monsanto pronouncements." *Id.* at 766 n.11. Nevertheless, the Court explained that the report could also indicate that Monsanto and its distributors entered into an illegal agreement and that "the interpretation of [the] ... testimony ... properly was left to the jury." *Id.*

In this case, Toledo presented evidence that Mack and its dealers met, discussed, and unanimously approved Bulletin 38-89 before Mack issued it. One view of the evidence may be, as Mack insists, that the dealers at the NDAC meeting were reacting to unilateral pronouncements by Mack, but another view is possible and entirely reasonable. Under *Monsanto*, then, how to view that evidence should be left to the jury.

Toledo also presented evidence that the conspiracy between Mack and its dealers continued from 1989 until well into the limitations period. As we have noted, in October 1989, Mack amended Bulletin 38-89 with Bulletin 38-89A, which stated a policy purportedly permitting dealers to sell

everywhere.[13]  However, Toledo presented direct evidence in the form of statements by various Mack executives that Mack's policy against out-of-AOR sales continued unchanged despite the amendment to Mack's official policy.  For example, when Toledo attempted to sell three trucks outside its AOR in 1991, Kevin Flaherty told Yeager that "our policy has not changed," and he indicated that Mack would provide sales assistance if Toledo sold the trucks inside its AOR but not outside of it. (App. at A4086.)  Similarly, Bob Grussing, Mack's Parts Manager, told Yeager in 1996 that dealers "constantly want Mack to get involved in these territorial disputes ... and to protect them from one another.  And right or wrong, we do that, you know."  (App. at A4147.)  Grussing also stated that such assistance was a "long standing tradition" and that "I don't know if I can break that."  *Id.*

Mack attacks the statements by Flaherty and Grussing in various ways.  Mack argues that Flaherty's statements do not show that Mack's policy remained unchanged because Flaherty was actually trying to convince Yeager to provide him with the information necessary to conduct a cross-check so that Toledo could compete on an equal footing with any

---

[13]Mack argues that its decision to withdraw Bulletin 38-89 and replace it with an official policy permitting out-of-AOR sales demonstrates that it withdrew from any conspiracy that had existed earlier in 1989.  Whether Mack withdrew from a conspiracy, however, is a jury question.  *Cf. United States v. Lowell*, 649 F.2d 950, 956 (3d Cir. 1981) ("[T]he question of withdrawal is for the finder of fact.").

other Mack dealer that might be attempting to make the same sale. Once again, Mack would have us view the evidence in the light most favorable to it, even though we are bound to do just the opposite at this point in the case. Moreover, Jack Lusty testified that, although Mack claimed that its system of cross-checks was used to ensure that all dealers competing for the same sale received equal sales assistance, the real purpose of cross-checks was to prevent dealers from competing effectively with one another. Because we must assume the truth of Lusty's testimony at this stage, Mack's characterization of Flaherty's statements, even if correct, would not prevent a jury from concluding that a conspiracy existed. Further, as Toledo points out, Flaherty's statement that "our policy has not changed" was made after Mack had ostensibly retracted its ban on sales assistance on out-of-AOR sales. *See Rossi*, 156 F.3d at 452, 478 (noting that actions by a party that are inconsistent with its stated policy support an inference of concerted action).

Mack's attack on Grussing's statement is also flawed. Mack argues that because Grussing's expertise was parts rather than trucks, his statements do not show a conspiracy involving truck sales. Again, this is an argument suited for presentation to a jury, not this Court. In addition, Yelles made several comments to Lusty that support the conclusion that, during the limitations period, Mack continued a policy of preventing dealers from selling outside their AORs. Of particular note, Yelles stated that Yeager "was not playing by the rules." (App. at A2825.) A jury could reasonably understand that the "rules" Yelles was talking about were an

40

agreement not to engage in price competition outside one's own AOR.[14]

Viewed in the light most favorable to Toledo, these statements by Mack executives are sufficient to allow a jury to decide whether an agreement between Mack and its dealers continued into the limitations period. Mack's arguments to the contrary fall short because they fail to recognize the nature of our inquiry. Rather than determining whether Mack actually violated § 1, our function now is simply to decide whether Toledo's evidence is sufficient to allow a jury to consider Toledo's § 1 claim.

Because Toledo's evidence was sufficient to allow a jury to conclude that Mack entered into a competition-restricting agreement with its dealers, the only remaining question before us as to that agreement is whether, if proven, it violates § 1 of the Sherman Act. In contrast to horizontal

---

[14]Lusty also testified that in 2001, Yelles told him that he "kn[ew] what [Toledo] [was] trying to do. [Toledo] wants to establish discounts and sell trucks all over the place. We are not going to let this happen." (App. at A2824.) Lusty also testified that in 2002, Yelles told him that Yeager was "just soliciting customers on price ... we have to beat the living shit out of him. ... [H]e is a son of a bitch." (App. at A2818.) Finally, Yelles himself testified that, on at least one occasion in 2003, he asked Mack's Controller to delay approving Toledo's request for sales assistance so that a different Mack dealer could make a sale.

price-fixing agreements between entities at the same level of a product's distribution chain, the legality of a vertical agreement that imposes a restriction on the dealer's ability to sell the manufacturer's product is governed by the rule of reason. *Leegin*, 127 S. Ct. at 2725. The rule of reason analysis applies even when, as in this case, the plaintiff alleges that the purpose of the vertical agreement between a manufacturer and its dealers is to support illegal horizontal agreements between multiple dealers. *Id.* at 2717 ("A horizontal cartel among competing manufacturers or competing retailers that decreases output or reduces competition in order to increase price is, and ought to be, *per se* unlawful. To the extent a vertical agreement setting minimum resale prices is entered upon to facilitate either type of cartel, it, too, would need to be held unlawful *under the rule of reason*.") (citation omitted and emphasis added).[15]

---

[15]We note that in *Rossi* we characterized the agreement at issue as horizontal and subject to *per se* analysis even though Rossi, like Toledo here, alleged that his direct competitors conspired with each other and with a common manufacturer to cut off his access to customers. 156 F.3d at 458, 461-62. At that time, agreements to set minimum resale prices were *per se* unlawful under § 1. *See id.* ("We agree with defendants that if this were simply a vertical conspiracy, between one horizontal competitor and one supplier or manufacturer, we would analyze it under the rule of reason *unless there were some evidence of price fixing.*") (emphasis added). After *Leegin*, vertical agreements to set prices are no longer *per se* unlawful but subject to the rule of reason. 127

"When conducting a rule of reason inquiry, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *AT & T Corp. v. JMC Telecom*, *LLC*,

470 F.3d 525, 531 n.7 (3d Cir. 2006) (citations omitted). In *Rossi*, we identified four factors that are relevant to an analysis of a restraint under the rule of reason:

> (1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy.

156 F.3d at 464-65 (citation omitted).

---

S. Ct. at 2725. In light of *Leegin*, we conclude that the rule of reason, not *per se* analysis, applies to the vertical agreement Toledo alleges was in existence here. *Cf. United States v. Fisher*, 502 F.3d 293, 296 (3d Cir. 2007) (citation omitted) (explaining that while a panel of this Court is ordinarily bound by the decision of a prior panel, a subsequent panel may depart from a previous panel's decision if required to do so by an intervening Supreme Court decision).

In *Leegin*, the Supreme Court also identified additional issues relevant to the rule of reason inquiry. Two of those are particularly relevant to Toledo's appeal. First, "[t]he source of the restraint may be an important consideration. If there is evidence retailers were the impetus for a vertical price restraint, there is a greater likelihood that the restraint facilitates a retailer cartel ... ." 127 S. Ct. at 2719. Second, "that a dominant manufacturer or retailer can abuse resale price maintenance for anti-competitive purposes may not be a serious concern unless the relevant entity has market power." *Id.* at 2720.

As to the first rule of reason factor we identified in *Rossi*, we have already explained that, viewed in the light most favorable to Toledo, the previously highlighted statements by Mack executives are sufficient to allow a jury to decide whether an agreement between Mack and its dealers continued into the limitations period. Further, we note that, consistent with *Leegin*, Toledo produced evidence that the agreement was the result of dealer pressure.

Toledo also presented sufficient evidence to allow a jury to conclude that the agreement between Mack and its dealers produced anti-competitive effects in the relevant product and geographic markets. Toledo bears the burden of identifying those markets and showing the anti-competitive effect of the agreement between Mack and its dealers. *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 210 (3d Cir. 2005). We have explained that proof of anti-competitive effects "can be achieved by demonstrating that the restraint is facially anticompetitive or that its enforcement reduced

44

output, raised prices or reduced quality. Alternatively, because proof that the concerted action actually caused anticompetitive effects is often impossible to sustain, proof of the defendant's market power will suffice." *Id.* Market power is "the ability to raise prices above those that would prevail in a competitive market." *United States v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir. 1993). At trial, Toledo presented expert testimony that Mack has power in two different product markets. The first of those markets is called the conventional straight truck market and includes vehicles that have an engine placed out in front of the driver's cab. The second market consists of low cab over engine trucks, or LCOE trucks, which have an engine placed underneath the driver's cab. Toledo's expert testified that Mack "[has] market power in both the heavy duty vocational LCOE, as well as conventional straight truck markets, whether you look at the U.S. as a whole or the U.S., excluding the west."[16] (App. at A1676.)

Toledo also presented sufficient evidence that "the objects of and the conduct pursuant to th[e] contract or conspiracy were illegal." *Rossi*, 156 F.3d at 466. As explained, Toledo has alleged that Mack agreed to support the horizontal agreement among the dealers to control prices. In *Leegin*, the Supreme Court expressly condemned such agreements. 127 S. Ct. at 2717.

---

[16]That assertion was supported by an analysis we need not recount here.

45

Finally, Toledo adduced evidence that it was injured as a result of the unlawful conspiracy. For example, Toledo presented evidence that, during the limitations period, Jeff Yelles asked Mack's Controller to delay approving one of Toledo's requests for sales assistance on an out-of-AOR sale so that another Mack dealer could make a sale. Toledo also presented evidence that, during the limitations period, Yelles refused to give sales assistance to Toledo on out-of-AOR sales.

Applying the rule of reason analysis to Toledo's § 1 claim, we conclude that Toledo presented sufficient evidence of an illegal agreement between Mack and its dealers for a jury to find for Toledo. Therefore, we vacate and remand the District Court's decision on that claim.

### B.  *Toledo's RPA Claim*

In addition to its § 1 claim, Toledo also argues that Mack's conduct violates the RPA's prohibition on discriminatory pricing. The relevant provision of the RPA provides that,

> [i]t shall be unlawful for any person engaged in commerce ... to discriminate in price between different purchasers of commodities of like grade and quality ... where the effect of such discrimination may be substantially to lessen competition ... or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such

discrimination, or with customers of either of them.

15 U.S.C. § 13(a).

Toledo argues that Mack engaged in discriminatory pricing by giving other Mack dealers more favorable discounts than were given to Toledo. At trial, Toledo presented expert testimony comparing the average amount of sales assistance Mack offered to Toledo with the average amount of sales assistance Mack offered other dealers located in the same general geographic area. Toledo's expert testified that the comparison demonstrated that Toledo received far less sales assistance than other nearby Mack dealers. However, Toledo's expert did not compare the amount of sales assistance Mack offered to Toledo and to other dealers when Toledo and another dealer actually competed against each other for a sale to the same customer. Therefore, Toledo's expert was unable to offer an opinion about whether Mack had discriminated against Toledo in head-to-head competition.

The RPA was originally enacted to "target the perceived harm to competition occasioned by powerful buyers rather than sellers; specifically, Congress responded to the advent of large chainstores, enterprises with the clout to obtain lower prices for goods than smaller buyers could demand." *Reeder-Simco GMC, Inc.*, 546 U.S. at 175. In the Supreme Court's recent decision in *Reeder-Simco*, the plaintiff was a Volvo dealer who, like Toledo, sold custom-made, specialized heavy-duty trucks. *Id.* at 170-71. Like

47

Toledo, Reeder-Simco relied heavily on discounts offered by the truck manufacturer, in that case Volvo, to sell its trucks. *Id.* Finally, like Toledo, Reeder-Simco alleged that the manufacturer had violated the RPA by offering it less favorable discounts than were offered to other dealers. *Id.* at 171-73. The Supreme Court noted that the alleged price discrimination did not implicate the original purpose of the RPA because "the allegedly favored purchasers are dealers with little resemblance to large independent department stores or chain operations, and the supplier's selective price discounting fosters competition among suppliers of different brands." *Id.* at 181. Elsewhere in its opinion, the Court reinforced the need to interpret the RPA narrowly, explaining that "[i]nterbrand competition ... is the 'primary concern of antitrust law.'" *Id*. at 180 (quoting *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 51 n.19 (1977)). The Court further explained that "[t]he [RPA] signals no large departure from that main concern. ... [W]e [will] resist interpretation geared more to the protection of existing *competitors* than to the stimulation of *competition*." *Id.* (emphasis in original). In short, the Court indicated that the RPA should be narrowly construed.

In *Crossroads Cogeneration Corp. v. Orange & Rockland Utilities, Inc.*, 159 F.3d 129, 142 (3d Cir. 1998), we were careful to keep the RPA confined. There, the defendant allegedly offered to sell electricity to certain customers at lower prices than it offered to its other customers, including Crossroads. *Id.* We held that Crossroads' RPA claim could not withstand a motion to dismiss because merely offering lower prices to a customer does not give rise to a price

48

discrimination claim. *Id.* at 142. Instead, "a plaintiff must allege facts to demonstrate that (1) the defendant made at least two contemporary sales of the same commodity at different prices to two different purchasers; and (2) the effect of such discrimination was to injure competition." *Id.* (citation omitted).

The Supreme Court in *Reeder-Simco* expressly declined to decide whether the RPA even applies to markets based on competitive bidding and special-order sales. *Reeder-Simco*, 546 U.S. at 180. Our decision in *Crossroads*, however, suggests that the RPA does not apply in a case such as this, which involves a single sale of a customized good via a competitive bidding process. Although Mack dealers may compete with one another by bidding against each other for the same deal, and the amount of sales assistance Mack offers to each dealer may well determine whether a customer chooses to accept a bid from one Mack dealer or another, Mack does not sell a truck to the dealer until the customer actually selects a dealer's bid. Because no sale takes place until a customer accepts a dealer's bid, the amount of sales assistance Mack is willing to provide to a particular dealer is part of an offer by Mack to sell, not a sale. Regardless of any competition between the dealers during the bidding process, only a dealer whose bid is accepted by a customer will actually buy a truck from Mack. Therefore, only one sale, not two, actually results.[17] *Cf. M.C. Mfg. Co., Inc. v. Texas*

---

[17]One might complain that this reasoning elevates form over substance, but we are bound by precedent and think it no

*Foundries, Inc.*, 517 F.2d 1059, 1065 (5th Cir. 1975) ("[I]n order for there to be discrimination between purchasers violative of [the RPA] there must be actual sales at two different prices to two different actual buyers ... ." (internal quotation marks and citation omitted)) .

Finally, we reject Toledo's argument that *Corn Products Refining Co. v. FTC*, 324 U.S. 726 (1945), requires us to abandon the two-sales requirement we articulated in *Crossroads*. *Corn Products* involved a claim under § 2(e) of the Clayton Act which prohibits discrimination "in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale ... by ... contributing to ... any services in connection with ... the sale or offering for sale of such commodity ... upon terms not accorded to all purchasers on proportionally equal terms." 15 U.S.C. § 13(d). In *Corn Products*, the Federal Trade Commission filed suit against a sugar supplier that had agreed to pay a large portion of the advertising expenses of the Curtiss Candy Company ("Curtiss"), one of its principal customers, but did not agree to a similar arrangement with another customer who bought the same products. *Id.* at 743. The sugar supplier argued that it had not provided advertising services to a "purchaser" of its

---

injustice to narrowly interpret the oft-questioned RPA. *Cf.* Antitrust Modernization Commission, Report and Recommendations, April 2007, at iii, 317-26 (recommendation by statutory commission, whose members were appointed by the President and Congress, that the RPA be repealed in its entirety).

product because nothing in the contract between it and Curtiss required Curtiss to buy sugar in exchange for the advertising. *Id.* The Court rejected that argument, noting that Curtiss had in fact purchased all of its sugar from the supplier even though the contract in question did not require it to do so, and that the supplier had not paid the advertising expenses of any of the other companies that bought its sugar products. *Id.* at 744.

*Corn Products*, decided long before our opinion in *Crossroads*, does not require us to abandon the two-sales requirement in RPA cases. Assuming *arguendo* that a claim of discriminatory advertising is analogous to a claim of discriminatory pricing, *Corn Products*, unlike *Reeder-Simco* and the present case, involved two actual sales to different customers, as opposed to mere offers to sell. In short, Toledo's policy arguments based on *Corn Products* do not override the import of *Reeder-Simco* or our own binding precedent. We will therefore affirm the District Court's grant of summary judgment for Mack on Toledo's RPA claim.

### C. *Mack's Misappropriation of Trade Secrets Counterclaim*

Toledo's final argument is that the District Court erred in granting judgment as a matter of law in favor of Mack on Mack's counterclaim for misappropriation of trade secrets. On appeal, Toledo argues that Mack's counterclaim is actually for breach of the MACSPEC 2001 license agreement, and that, under Pennsylvania's "gist of the action" doctrine, Mack cannot recover in tort for breach of contract. The "gist

of the action" doctrine is "designed to maintain the conceptual distinction between breach of contract claims and tort claims [by] precluding plaintiffs from recasting ordinary breach of contract claims into tort claims."  *eToll Inc. v. Elias/Savion Advertising Inc.*, 811 A.2d 10, 14 (Pa. Super. Ct. 2002).  The focus of an analysis under the "gist of the action" doctrine is whether "actions lie from a breach of the duties imposed as a matter of social policy" or "from the breach of duties imposed by mutual consensus."  *Redevelopment Auth. of Cambria County v. Int'l Ins. Co.*, 685 A.2d 581, 590 (Pa. Super. Ct. 1995).  We agree with the District Court that Mack's claim for misappropriation of trade secrets sounds primarily in tort, rather than contract law, and therefore the "gist of the action" doctrine does not bar Mack's counterclaim.

The Ohio Court of Appeals found that Mack took several steps independent of issuing a license agreement to insure that its dealers did not give copies of the MACSPEC 2001 software to unauthorized persons.  Those steps included the use of "unlock codes" during the installation process and prominent warning screens informing users that unauthorized use would subject them to civil and criminal penalties.  *Mack Trucks, Inc. v. Motor Vehicle Dealers Bd.*, No. 05AP-768, 2006 WL 1495122, at *7 (Ohio Ct. App. June 1, 2006).  Thus, Toledo's duty to keep the software confidential did not arise simply from its license agreement with Mack but, instead, had roots in its independent duty to keep Mack's trade secrets confidential, and the counterclaim can properly

52

be seen as sounding in tort.[18]  We therefore reject Toledo's argument and affirm the District Court's grant of judgment as a matter of law on the counterclaim.

*IV.    Conclusion*

Mack presented sufficient evidence to allow a jury to consider its claim under § 1 of the Sherman Act. Accordingly, we will vacate the District Court's grant of judgment as a matter of law and remand that claim for further proceedings.  We will affirm the District Court's disposition of Toledo's RPA claim and Mack's counterclaim for misappropriation of trade secrets.

---

[18]In addition, we note that Toledo initially denied the existence of the contract it now uses to invoke the "gist of the action" doctrine.  Toledo cannot properly change its position now. *Tops Apparel Mfg. Co. v. Rothman*, 244 A.2d 436, 439 n.8 (Pa. 1968) ("When a [party] alleges a fact in a court of justice, for [its] advantage, [it] shall not be allowed to contradict it afterwards.")